**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | |
| | : | **Chapter 11** |
| **MBMK PROPERTY HOLDINGS, LLC,** | : | |
| | : | **Bankruptcy No. 10-18687 (MDC)** |
| Debtor | : | |
| | : | |
| **MBMK PROPERTY HOLDINGS, LLC,** | : | |
| | : | |
| Plaintiff | : | **Adversary Proceeding No. _____** |
| | : | |
| | : | |
| v. | : | |
| | : | |
| **WILMINGTON TRUST, NATIONAL** | : | |
| **ASSOCIATION, As Trustee, For** | : | |
| **The Benefit Of The Holders Of** | : | |
| **Corevest American Finance** | : | |
| **2018-2 Trust Mortgage** | : | |
| **Pass-Through Certificates;** | : | |
| | : | |
| **BAY MANAGEMENT GROUP OF** | : | |
| **PHILADELPHIA, LLC;** | : | |
| | : | |
| **JAMES PAUL, d/b/a James Paul of** | : | |
| **the ALPS Group;** | : | |
| | : | |
| and | : | |
| | : | |
| **ALPS GROUP, INC. d/b/a James Paul** | : | |
| **The ALPS Group,** | : | |
| | : | |
| Defendants | : | |

**ADVERSARY COMPLAINT**

Plaintiff, MBMK Property Holdings, LLC, debtor-in-possession in the above-captioned Bankruptcy Case, by and through its undersigned counsel, alleges the following as its complaint against the Defendants:

## I.    THE PARTIES

### A. Plaintiff and Debtor, MBMK Property Holdings, LLC.

1.    Plaintiff, MBMK Property Holdings, LLC, is a Delaware limited liability company with an address at 7014 Pennsylvania Avenue, Philadelphia, Pennsylvania 19082.

2.    Plaintiff is the Debtor in the above-captioned bankruptcy case (the "Bankruptcy Case") under Chapter 11, Subchapter 5, of Title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code"), commenced by voluntary petition filed in this Court on November 21, 2022 (the "Petition Date"). Plaintiff is referred to herein as "Plaintiff," "MBMK"1 or "Debtor."

3.    At all times relevant hereto, Plaintiff owned thirteen residential rental properties – eleven in Delaware County, Pennsylvania and two in Philadelphia County, Pennsylvania – identified in Exhibit "A" hereto and referred to herein as the "Debtor Properties."[2]

4.    Plaintiff also operated the Debtor Properties from their acquisition in September of 2018 and until the commencement of the "Custodial Period" (as defined below), during which one or more of the Defendants exercised possession and control of the Debtor Properties and their operation.

---

[1] "MBMK" is used herein to refer to the Plaintiff and Debtor, MBMK Property Holding, LLC, as distinguished from its affiliate, and sole member, MBMK Asset Management, LLC, also a Delaware limited liability company.
[2] The Debtor Properties were sold in August 31, 2023, pursuant to this Court's Order of August 16, 2023 [Bankruptcy Docket No.146] (the "Sale Order"). Pursuant to paragraph 11 of the Sale Order the net sale proceeds of $1,706,715.53 are held by the title company subject to the liens, security interests and claims not satisfied at closing on the sale.

5.      As alleged in more detail below, for a period of 925 days, commencing November 30, 2020 and continuing until approximately June 13, 2023, one or more of the Defendants herein were in effective possession, custody and control of the Debtor's operating assets. This period is referred to herein as the "Custodial Period," denoting the period during which the Debtor's operating assets were in the possession, custody and control of one or more of the Defendants named herein, and for which it is alleged herein that the Defendants are jointly and separately liable to account in equity; and the property in the possession, custody and control of one or more of the Defendants during this Custodial Period, including the 13 Debtor Properties and the leases and rents relating to same, is referred to herein as the "Custodial Property."

**B.  Defendant Wilmington Trust.**

6.      Defendant, Wilmington Trust, National Association, is a national banking association, and is named herein in its capacity as Trustee of a real estate mortgage investment conduit trust (the "Trust") formed under section 860D of the Internal Revenue Code (26 U.S.C §806D) for the benefit of the holders of certain investments known as the CoreVest American Finance 2018-2 Trust Mortgage Pass-Through Certificates TD Bank, N.A.

7.      "Wilmington Trust," as used herein, refers to the Defendant Wilmington Trust, National Association, in its capacity as Trustee of the Trust, and its agents acting on its behalf with respect to the loan at issue herein, including (without limitation), Midland Loan Services ("Midland") and its counsel, and the other Defendants alleged herein to be acting as agents of or otherwise under the direct or indirect influence and control of Wilmington Trust, with respect to the Custodial Property during the Custodial Period.

8.     Wilmington Trust is a creditor and party in interest in the above-captioned

Bankruptcy Case, asserting a secured claim in the amount of $2,084,794.88 (the "Wilmington

Trust Claim"), filed as Proof of Claim No. 15-1 in the above-captioned Bankruptcy Case.

9.     Debtor disputes the amount, extent and priority of the Wilmington Trust Claim

for the reasons set forth herein and in Debtor's contemporaneously filed Objection to Proof of

Claim No. 15-1.

10.     As alleged in more detail below, Defendant Wilmington Trust seized effective

possession, custody and control of the Custodial Property, being substantially all of Debtor's

operating assets, on November 30, 2020, and continued to exercise such possession, custody and

control, directly and indirectly, through its agents, (including Defendants Bay Management

Group of Philadelphia, LLC, James Paul and ALPS Group, Inc.) throughout the Custodial

Period.

11.     As alleged below, as a consequence of its effective possession, custody and

control of the Custodial Property, Defendant Wilmington Trust owed fiduciary duties to Debtor

with respect to the use, management, care and disposition of such assets during the Custodial

Period, and is liable to account, jointly and severally, with Defendants Bay Management Group

of Philadelphia, LLC, James Paul and ALPS Group, Inc., for the use, management, care and

disposition of the Custodial Property, and for any waste or other damages to such property

caused by its acts and omissions in the exercise of possession, custody and control, during the

Custodial Period.

**C. Defendant Bay Management Group of Philadelphia, LLC.**

12.     Defendant, Bay Management Group of Philadelphia, LLC (referred to herein as,

"BMG") is a limited liability company organized under the laws of the State of Maryland and

doing business in the Commonwealth of Pennsylvania at 1080 North Delaware Avenue,
Philadelphia, Pennsylvania 19125.

13.     As alleged below, BMG served from approximately September of 2019 through
March 2022, as manager of the Custodial Property, initially as agent under contract with the
Debtor and later, for the first fifteen months of the Custodial Period (approximately December
2020 through March 2022), as agent for Wilmington Trust.

14.     As alleged below, BMG owed fiduciary duties to Debtor with respect to the use,
care, management and disposition of the Custodial Property during the Custodial Period, and is
liable to account, jointly and severally, with Defendants Wilmington Trust and James Paul and
ALPS Group, Inc., for the use, management, care and disposition of the Custodial Property, and
for any waste or other damages to such property caused by its acts and omissions during the
Custodial Period.

**D.  Defendants James Paul and ALPS Group.**

15.     Defendant James Paul ("Paul") is an individual and, on information and belief, a
resident of the State of Illinois, doing business as "James Paul of the ALPS Group," at 8779 W
Laraway Road, Frankfort, Illinois 60423.

16.     Defendant ALPS Group, Inc. is an Illinois corporation, doing business as "James
Paul of the ALPS Group" at the same address.

17.     On information and belief, Defendants Paul and ALPS Group, Inc. do business
together as "James Paul of the ALPS Group," for the purpose of securing business for ALPS
Group, Inc. through the court-appointment of Paul as a receiver of assets.

18.     As part of this common enterprise, in March of 2022 Defendant Paul, doing
business as "James Paul of ALPS Group," was appointed receiver of the Debtor's operating

assets (being thirteen residential rental properties, leases and rents) by Orders of the

Pennsylvania Courts of Common Pleas for Delaware and Philadelphia counties, and used that

appointment to generate fees for ALPS Group, Inc.

19.    As alleged below, Defendants Paul and ALPS Group, Inc., doing business as

"James Paul of the ALPS Group," were in possession, custody and control of the Custodial

Property during the last fifteen months of the Custodial Period, from approximately March 18,

2022 through June 13, 2023, and are liable to account, jointly and severally, with Defendants

Wilmington Trust and Bay Management Group of Philadelphia, LLC, for the use, management,

care and disposition of the Custodial Property, and for any waste or other damages to such

property caused by its acts and omissions during the Custodial Period. Reference in this

Complaint to "Paul/ALPS" are intended to refer, jointly and severally, to Defendant Paul and

Defendant ALPS Group, Inc.

**II.    JURISDICTION AND VENUE**

20.    Jurisdiction in this adversary proceeding is pursuant to 28 U.S.C. §157 and §1334,

and Rule 7001 of the Federal Rules of Bankruptcy Procedure ("FRBP"), as a proceeding arising

under title 11 of the United States Code (the "Bankruptcy Code") and arising in or related to the

above-captioned jointly administered cases under chapter 11 of the Bankruptcy Code, to recover

money or property and/or to subordinate claims.

21.    This is a core proceeding under 28 U.S.C. §157(b)(2) (A), (H), (K) and (O).

22.    Venue is proper in this Court under 28 U.S.C. §1409.

## III.    FACTUAL BACKGROUND

### A.  The Formation of the Debtor in 2018.

23.    Mohsin Khawaja ("Khawaja") and Matthew Breen ("Breen") formed the Debtor in August 2018 to acquire, own and operate the Debtor Properties.

24.    Twelve of the thirteen Debtor Properties were previously owned by Khawaja and members of his family, and one was owned by Breen.

25.    A Pennsylvania limited liability company, MBMK Asset Management, LLC (herein, "Asset Management") was formed at the same time, with Khawaja and Breen as its sole members, and the Debtor was formed with Asset Management as its sole member.

26.    Initially, and until Khawaja's personal bankruptcy led to his exclusion from management, Khawaja and Breen were the sole officers in the Debtor, with Breen holding the offices of President, Secretary and Treasurer, and Khawaja holding the office of Vice-President.

27.    In this time period prior to Khawaja's exclusion from management, Khawaja was primarily responsible for the management of the Debtor Properties – overseeing leasing, maintenance and repair and tenant relations; and Breen was primarily responsible for "back office" management – overseeing the corporate, legal and financial affairs of the Debtor and Asset Management.

### B.  The Wilmington Trust Loan.

28.    The Debtor acquired the Debtor Properties on September 27, 2018.

29.    The acquisition of the Debtor Properties was financed in part with a loan from CoreVest American Finance Lender LLC ("CoreVest"), that was assigned to Wilmington Trust on or about December 13, 2018, the Loan Documents, and is referred to herein as the "Wilmington Trust Loan."

7

30.    The Wilmington Trust Loan was in the original principal amount of
$1,120,700.00 on terms set forth in a certain Commercial Loan Agreement between CoreVest, as
"Lender," and the Debtor, as "Borrower," dated September 27, 2018 (the "Loan Agreement"),
and other agreements entered into in connection with and referenced in the Loan Agreement as
"Loan Documents."  A true and correct copy of the Loan Agreement is attached hereto as
Exhibit "B."

31.    The Loan Documents referenced in the Loan Agreement include, *inter alia*, the
following:

   a.  A Promissory Note dated September 27, 2018, in the original principal
       amount of $1,120,700.00 (the "Note"), executed by the Debtor in favor of the
       Lender, a true and correct copy of which is attached hereto as Exhibit "C."

   b.  Two Open-Ended Mortgage, Assignment of Leases and Rents, Security
       Agreement and Fixture Filings dated September 26, 2018, one (the
       "Philadelphia County Mortgage"), on the two real properties owned by Debtor
       and situated in Philadelphia County, recorded with the Recorder of Deeds,
       Philadelphia County, as Instrument No. 53425130, on October 3, 2018; and
       the other (the 'Delaware County Mortgage"), on the eleven real properties
       situated in Delaware County, Pennsylvania, recorded with the Recorder of
       Deeds, Delaware County, as Instrument No. 2018048437 on October 3, 2018.
       A true and correct copy of the Philadelphia County Mortgage is attached
       hereto as Exhibit "D" and a true and correct copy of the Delaware County
       Mortgage is attached hereto as Exhibit "E."

c. The personal guaranties of Khawaja and Breen pursuant to a Sponsor

Guaranty Agreement from each of them, dated September 27, 2018 ("Sponsor

Guaranty").

32. The Loan was to be repaid with interest at 6.66 % per annum, in monthly

installments amortized over thirty years, but with the full remaining balance to be paid on the

"Stated Maturity Date" of October 9, 2028.

33. The monthly installments of principal and interest (referred to in the Loan

Agreement as a "Monthly Debt Service Payment") were in the amount of $7,270.00.

34. In addition to the Monthly Debt Service Payment, the following amounts were

required on a monthly basis:

a. A monthly escrow payment toward payment of real estate taxes on the Debtor

Properties (the "Tax Escrow"), initially in the amount of $3,101.55.

b. A monthly escrow payment toward payment of premiums on insurance on the

Debtor Properties (the "Insurance Escrow"), initially in the amount of

$695.49.

c. A monthly escrow toward reserves for capital improvements to the properties

("Reserve Escrow"), initially in the amount of $541.67.

These amounts are referred to herein collectively as the "Monthly Escrows."

35. At all times relevant hereto, Midland acted as the servicing agent ("Servicer") of

the Lender, including as agent for CoreVest prior to the assignment to Wilmington Trust and for

Wilmington Trust thereafter, with broad authority and responsibility for the administration and

enforcement of the Loan in accordance with the Loan Documents.

36.    As Servicer, Midland issued monthly statements (the "Monthly Loan
Statements"), setting forth (*inter alia*) the following as of the date specified on the statement:

    a.  The principal balance, interest rate, year to date interest and escrow balances and disbursements;

    b.  Past due payments of principle, interest, escrows, default interest and other;

    c.  Current amounts due with the next payment for principal, interest, escrows, late charges and other; and

    d.  Total payment due and due date and instructions for payment.

Attached hereto as Exhibit "F" is true and correct copy of the Monthly Loan Statement issued by Midland as of October 25, 2018.

37.    The Loan Documents also included an Assignment of Management Agreement and Subordination of Management Fees ("First Assignment of Management Agreement"), dated September 27, 2019, between the Debtor, CoreVest (as "Lender") and Debtor's property management company, Property Pals, LLC ("Property Pals").   A true and correct copy of the First Assignment of Management Agreement, with the Property Pals Property Management Agreement, is attached hereto as Exhibit "G."

38.    Property Pals was another Pennsylvania limited liability company owned and operated by Khawaja and Breen, through which Khawaja managed the Debtor Properties until his exclusion from management after August of 2019.

39.    Pursuant to the First Assignment of Management Agreement, The Lender was entitled, upon an event of default on the Loan, to exercise the rights of the Debtor under the Property Management Agreement with Property Pals.

### C. The Khawaja Bankruptcy and Wilmington Trust's Response.

40. On August 30, 2019, Khawaja filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code before this Court, captioned In re: Mohsin Khawaja, Case No. 19-15430-mdc (the "Khawaja Bankruptcy").

41. The filing of the Khawaja Bankruptcy resulted in the conversion of Khawaja's membership to an economic interest, not eligible to participate in the management of Asset Management, which was the sole managing member of the Debtor.

42. The filing of the Khawaja Bankruptcy was also within the literal terms of an "Event of Bankruptcy" with respect to a "Restricted Person" (Khawaja), listed as an "Event of Default" in Section 8.1(d) of the Loan Agreement.

43. Wilmington Trust was immediately aware of the Khawaja Bankruptcy filing but did not declare or enforce the default until on and after January 9, 2020.

44. Instead, on September 3, 2019, Wilmington Trust agreed to replace Property Pals with Defendant BMG as Property Manager of the Debtor Properties, and entered into a new Assignment of Management Agreement (the "Second Assignment of Management Agreement"), pursuant to which Wilmington Trust was entitled, upon an event of default on the Loan, to exercise the rights of the Debtor under the Property Management Agreement with Property Pals. A true and correct copy of the Second Assignment of Management Agreement Management Agreement, with the BMG Property Management Agreement, is attached hereto as Exhibit "H."

45. As a result of the foregoing, Breen would exercise exclusive managerial control over the Debtor and its relations with Wilmington Trust and BMG, and Khawaja would thereafter be excluded from participation in such affairs, until after July 22, 2022, when

Khawaja's managerial authority was restored pursuant to the "Breen-Khawaja Settlement Agreement," described later in this Complaint.

46.     As a result of the exclusion of Khawaja from management of the Debtor and its relations with Wilmington Trust in this time period, the allegations of present management of the Debtor (under Khawaja) concerning these matters rely extensively on information contained in the records of the Debtor delivered to Khawaja by Breen in August 2022.

47.     Wilmington Trust continued after August 30, 2019 to issue and send Monthly Loan Statements invoicing the Debtor for the regular amounts due on the Loan for Monthly Debt Payments and Escrows, without default interest, without late charges and without any other notification whatsoever indicating that Wilmington Trust had acted or intended to act on any Event of Default.  See copies of Monthly Loan Statements for the months of September 2019 through February 2020, included in Exhibit "I" hereto.

48.     The Debtor continued to make all payments due on the Loan and as invoiced in the Monthly Loan Statements issued by Wilmington Trust for September 2019 through February 2020, and those statements (included in Exhibit "I" hereto) repeatedly, expressly and unequivocally represented the Debtor was current on all payments.

   **D.  Wilmington Trust's Improper Declaration of Default and Enforcement Actions.**

49.     Despite the foregoing, and contrary to its prior actions and declarations, Wilmington Trust issued a Notice of Default and Intent to Foreclose to the Debtor on January 9, 2020 (the "January 9, 2020 Notice"). A true and correct copy of the January 9, 2020 is attached hereto as Exhibit "J."

50.    The January 9, 2020 Notice not only declared for the first time that the Debtor was in default due to the filing of the Khawaja Bankruptcy five months before, but threatened enforcement of its legal remedies on account of this alleged Event of Default.

51.    The January 9, 2020 Notice was the first in a series of confused, contradictory, overreaching and improper actions by Wilmington Trust that were, separately and collectively, breaches of the Loan Documents and applicable law, including the laws of the State of New York, applicable under Section 9.20 of the Loan Agreement, restricting the enforcement of non-monetary defaults, and the implied covenant of good faith and fair dealing applicable under the laws of New York and Pennsylvania.

52.    The filing of the Khawaja Bankruptcy was an immaterial, non-monetary default that resulted in no interruption of loan payments or other harm to Wilmington Trust or its collateral, and the response of Wilmington Trust clearly and unequivocally confirmed its intention to waive the event of default, or at least forbear from the enforcement of remedies on account of this event.

53.    The declaration of the default in the January 9, 2020 Notice was in violation of this waiver.

54.    In addition, and in the alternative, the actions taken thereafter to enforce remedies based on the filing of Khawaja's Bankruptcy, were in breach of the Loan Agreement and applicable law, as the enforcement of such remedies on account of this event was arbitrary, inequitable and in bad faith.

55.    The content and context of the January 9, 2020 Notice further reinforces the inequity, unfairness and impropriety of its enforcement by Wilmington Trust:

    a.   The Notice demanded that the Debtor cure the default by January 19, 2020 or

Lender would pursue all remedies available to it, but did not demand any

specific payment or provide any instruction on how to "cure" the default.

    b.   If the cure demanded was the withdraw of the Khawaja Bankruptcy, such a

demand is, on its face, contrary to New York law restricting the arbitrary

enforcement of such non-monetary defaults, as well as the implied covenant

of good faith and fair dealing.

    c.   It was utterly impracticable for the Debtor to comply with a demand to

withdraw the Khawaja Bankruptcy filing.

56.     The only payment instructions Debtor had from Wilmington Trust as of January 9, 2020 were those invoiced in the Monthly Loan Statements issued through December 25, 2019 (see Exhibit "I" hereto), for the regular Monthly Debt Payment and Escrows totaling $12,250.90.

57.     The Debtor made a payment in that amount on or about January 9, 2020.

58.     Wilmington Trust accepted the Debtor's January 9, 2020 payment and issued another Monthly Loan Statement as of January 26, 2021 (included in Exhibit "I"), reflecting the acceptance of the January payment, representing Debtor was current on the Loan, and invoicing the Debtor only for regular the Monthly Debt Payment and Escrows due on February 9, 2020 in the amount of $11,680.74.

59.     The Debtor's records indicate the Debtor tendered an ACH payment of $11,680.74; but the payment was returned the next day without explanation.

60.     The next Monthly Loan Statement, as of February 23, 2020 (included in Exhibit "H"), then claimed $35,986.48 was past due, including $24,305.74 for allegedly "Past Due Default Interest," demanding a total payment of $48,311.26 by March 9, 2023.

61.     The February 23, 2020 Statement does not explain, and the Debtor cannot now determine, how this "Past Due Default Interest" was calculated – on what amount it was accrued and from what date; but using the 5% Default Rate under Section 1.1of the Loan Agreement, it is apparent that the $24,305.74 amount represents a retroactive assessment of approximately 160 days of Default Interest.

62.     On information and belief, this February 23, 2020 statement was the first notice to the Debtor of the accrual of or demand for payment of Default Interest on account of the Khawaja Bankruptcy filing.

63.     On information and belief, the Debtor did not have sufficient cash flow at the time to pay this retroactive Default Interest Charge by March 9, 2023, as demanded, and the demand effectively rendered the Debtor immediately insolvent on a "cash-flow" basis, but only because of the unwarranted, inequitable and bad faith demand for retroactive Default Interest.

64.     On information and belief, Wilmington Trust immediately added other improper and oppressive monetary demands as a condition of forbearance or repayment of the Loan, including:

      a.  The immediate, and retroactive demand of an arbitrary "Special Servicing Fee" of $750.00 a month that was not authorized by any provision of the Loan Agreement and appears, on its face, to be an effort of the Servicer, Midland, to use the threat of enforcement of remedies to leverage additional compensation for itself.  These charges would eventually accumulate to $24,000.00 in Wilmington Trust's payoff statement of August 17, 2022, but disappeared from its Proof of Claim.

b.  The immediate and repeated imposition of arbitrary, excessive and punitive monthly and miscellaneous Late Charges, in violation of the Loan Agreement and applicable law.  These charges appear to have been generated automatically, in the absence of any late payments and without relation to any actual or fair estimate of the cost of processing late payments or other actual costs; and the monthly charges range wildly from as low as $584.04 to as high as $13,528.02.  According to Wilmington Trust's payoff statement of August 17, 2022, these charges accumulated to the sum of $27,217.62, and somehow ballooned to $66,610.50 in Wilmington Trust's Proof of Claim.

c.  The repeated demand for payment of an unauthorized "Prepayment Premium," in apparent reliance on the "Yield Maintenance Premium" provisions of the Loan Agreement, but improperly asserted, in this case, in the absence of any prepayment, voluntary or otherwise.  This amorphous claim varied between the $216,101.59 claimed in Wilmington Trust's payoff statement of August 17, 2022, , the $147,599.81 claimed in its payoff statement of February 2, 2023  and the $149,916.70 now claimed in its Proof of Claim No. 15-1 in the Bankruptcy Case..

d.  The immediate and repeated insistence on the payment of various, so-called "Protected Advances."  This included insistence on payment of substantial sums for "Protective Advance-Legal" – an apparent assertion of a claim for attorneys' fees and costs, demanded without any accounting, documentation or other evidence from which the Debtor can verify or determine the reasonableness of such fees and costs.  Despite the lack of any accounting or

substantiation, Wilmington Trust insisted on payment of "Protected Advance
– Legal" in the amount of $149,312.48 in its payoff statement of August 17,
2022.

65.    By these demands, Wilmington Trust used an immaterial, non-monetary default
as the pretense for imposing new, unwarranted and oppressive monetary demands on the Debtor,
that Wilmington Trust knew or should have known the Debtor was incapable of satisfying,
thereby depriving the Debtor of the ability to continue payment of the Loan on regular terms.

66.    The Debtor, under Breen's management, suspended further payments to
Wilmington Trust in and after February 2020, on information and belief, because compliance
with these new, unwarranted and oppressive demands was impracticable and made any payments
futile.

67.    The suspension of payments by Debtor in and after February of 2020 was
warranted in the face of Wilmington Trust's prior breaches of the Loan Documents, and
inequitable and bad faith conduct described above.

### E.  The Custodial Period.

#### 1.  Wilmington Trust's November 30, 2020 seizure of rents and property management.

68.    On November 30, 2020, Wilmington Trust gave notice it was exercising its rights
under the assignment of leases and rents provisions ("Assignment of Rents") in Section 1.02 of
the Mortgages (Exhibits "D" and "E" hereto), to seize control of the leases and rents on the
Debtor Properties.

69.    To do so, Wilmington Trusted had its counsel, Walter Weir, Esquire, of Weir &
Partners, LLP, notify BMG, through its president, Dana Andersen, that the Debtor had defaulted
on the Loan and that Wilmington Trust was acting pursuant to the Second Assignment of

Management Agreement with the Debtor and BMG (Exhibit "I" hereto), to take control of the

properties, leases and rents, as follows:

> Pursuant to the rights [under the Assignment of Rents and the Second
> Assignment of Management Agreement], the Borrower [the Debtor] authorized
> the Lender [Wilmington Trust] to direct Bay Management Group Philadelphia
> LLC, as property manager, under the various leaseholds [on the Debtor
> Properties] (the "Leases"), and the Lender so directs, Bay Management to
> collect and hold the rents from any of the Leased Properties, now in, or
> hereafter coming into, your possession, as agent for Lender, pending further
> instructions from the Lender.

A true and correct copy of the November 30, 2020 letter from Attorney Wier to BMG's Dana

Andersen, providing this instruction (herein the "November 30, 2020 Notice") is attached hereto

as Exhibit "K."

70.    At the time of the November 30, 2020 Notice, BMG was exercising managerial

possession, custody and control of all thirteen of the Debtor Properties, responsible for all leasing

and tenant relations, maintenance and repair, and collecting and receiving all rents from the

properties, under the terms and conditions of the BMG Property Management Agreement

attached to the Second Assignment of Management Agreement and included in Exhibit "K"

hereto.

71.    Prior to the November 30, 2020 Notice, BMG exercised this possession, custody

and control and performed these responsibilities on behalf of, and as agent for, the Debtor under

and subject to the Debtor's oversight and control.

72.    As of and after the November 30, 2020 Notice, and until March of 2022, BMG

exercised this possession, custody and control and performed these responsibilities on behalf of,

and as agent for, Wilmington Trust under and subject to Wilmington Trust's oversight and

control.

73.     As such, Wilmington Trust was, as of and after November 30, 2020, in effective possession, custody and control of the Debtor Properties, leases and rents, referred to herein as the "Custodial Property."

74.     Wilmington Trust continued to exercise effective possession, custody and control over the Custodial Property through Defendant BMG as its agent and later (as described below) through the appointment of Defendants Paul and ALPS as Receiver, for the duration of the Custodial Period, and until the return of control to the Debtor in this case pursuant to this Court's Order of June 13, 2023.

75.     Significantly, pursuant to Section 1.02(b) of the Mortgages, and otherwise applicable law, Wilmington Trust was obligated to disburse and/or apply any rents in its possession or control, in accordance with the terms of the Loan Agreement, either to the proper operation, maintenance and care of the Debtor Properties or to the indebtedness under the Loan.

76.     As set forth below, Wilmington Trust would receive rents, through its agents, Defendants BMG and Paul/ALPS, throughout the Custodial Period, without ever accounting for the use, management, care or disposition of same and, on information and belief, without ever applying any portion to the indebtedness under the Loan Agreement.

77.     In the meantime, as set forth below, Debtor believes and avers that the Custodial Property, including the Debtor Properties, rents and leases, was grossly mismanaged and neglected, and suffered serious deterioration and damage amounting to waste during the Custodial Period.

**2. Wilmington Trust's December 9, 2020 Foreclosure Actions and Requests for a Receiver.**

78.     On December 9, 2020, Wilmington Trust filed Complaints in Mortgage Foreclosure in two state courts: one in the Delaware County Court of Common Pleas (No. CV-

2020-008284) (the "Delaware County Foreclosure") to foreclose on the eleven Debtor Properties

in Philadelphia County; and the other in the Philadelphia County Court of Common Pleas (No.

CV-2020-00225) (the "Philadelphia County Foreclosure") to foreclose on the two Debtor

Properties in Philadelphia County. The Delaware County Foreclosure and Philadelphia County

Foreclosure are referred to together as the "Foreclosure Actions".

79.    Other than referencing different properties, the Complaints in each of the two

Foreclosure Actions contained essentially identical allegations in support of the request for

foreclosure on the Mortgages and appointment of a receiver for the Debtor Properties, leases and

rents. A true and correct copy of the Complaint filed in the Delaware County Foreclosure is

attached hereto (without exhibits) as Exhibit "L."

80.    Significantly, the Foreclosure Complaints do not mention the Khawaja

Bankruptcy at all, alleging only the unspecified and undated "[failure] to make timely payments

of principal and interest when due" as the basis of default on the Loan warranting foreclosure on

the Mortgage. (See Foreclosure Complaint, Exhibit "L" hereto, at ¶15)

81.    The Foreclosure Complaints alleged the following amounts to be due on the Loan

as of November 30, 2020:

- $1,105,803.34 in Principle

- $68,201.35 in Interest

- $82,862.89 in Default Interest

- $6,525.38 in Late Charges

- $41,744.03 in Other Fees

- $5,000 in Attorney Fee

(Foreclosure Complaint, ¶16)

82.     Among other things, this itemization appears to incorporate the wrongful claim for retroactive Default Interest, despite ignoring the alleged Event of Default of the Khawaja Bankruptcy that was originally asserted to support that retroactive accrual; and implies, on the one hand, that the debt has been accelerated, while apparently continuing the arbitrary, punitive and inconsistent accrual of Late Charges on monthly payments.

83.     Missing from the demand in the Foreclosure Complaints, however, was any claim for a Prepayment Premium or Special Servicing Fees.

84.     The improper and punitive assessment of a Prepayment Penalty would, as described below, appear without explanation in subsequent demands by Wilmington Trust – including in its Proof of Claim No 15-1.

85.     The improper and unauthorized demand for Special Servicing Fees would reappear in subsequent demands by Wilmington Trust, but then disappear in its Proof of Claim No 15-1.

86.     With the Foreclosure Complaints, Wilmington Trust also filed Emergency Motions (the "Receiver Motions") in each of the Foreclosure Actions, seeking appointment of "James Paul of the ALPS Group" (that is, Defendants Paul and ALPS) as receiver for the Debtor Properties as well as the rents, alleging the likelihood of immediate and irreparable harm if a receiver was not appointed to protect the Custodial Property from alleged mismanagement by the Debtor and Khawaja.

87.     In making such allegations in the Emergency Motions, Wilmington Trust intentionally ignored the fact that it had already taken possession, custody and control of the Custodial Property from the Debtor as of November 30, 2020, through its agent, BMG.

88.    Debtor believes and avers that Wilmington Trust's true motive in requesting a

receiver was not to protect the Custodial Property, but to attempt to insulate itself from the

fiduciary duties and liabilities for mismanagement and waste already assumed by it, and justly

imposed upon it, as a mortgagee in possession.

### 3.    Breen files MBMK's 2021 Bankruptcy in February 2021.

89.    On February 10, 2021, Breen caused the Debtor to file a bankruptcy case –

Chapter 11 Case No. 21-10332-mdc in this Court (the "2021 MBMK Bankruptcy").

90.    Approximately a year later, the First MBMK Bankruptcy was dismissed by Order

of this Court dated January 25, 2022 [Bankruptcy Docket No. 97 in First MBMK Bankruptcy],

on Motion of the United States Trustee, for failure of the Debtor to file Schedules and Statements

of Financial Affairs, appear for the Creditor's Meeting, or file monthly operating reports in the

case.

91.    Khawaja, still excluded from management of the Debtor, opposed the dismissal of

the case, seeking instead to have it converted to a case under Chapter 7 of the Bankruptcy Code.

92.    Wilmington Trust, however, joined in the United States Trustee's Motion to

Dismiss and opposed the conversion to Chapter 7.

93.    Meanwhile, in the year that the First MBMK Bankruptcy Case was pending,

Wilmington Trust continued to exercise possession, custody and control over the Custodial

Property, including all 13 of the Debtor Properties and leases and rents relating to same, through

BMG as its agent and property manager, and failed to account for the use, management, care and

disposition of these assets.

### 4. Wilmington Trust replaces BMG with Defendants Paul/ ALPS as Receiver in March 2022.

94.    Following the dismissal of the First MBMK Bankruptcy, Wilmington Trust renewed its efforts in the Foreclosure Actions to have Defendants Paul and ALPS appointed as receiver of the Custodial Property, filing a new "Emergency Motion" for the appointment of Paul/ALPS as receiver in the Philadelphia Foreclosure on February 23, 2022, and resuming the pursuit of its pending "Emergency Motion" in the Delaware County Foreclosure.

95.    At the time, Wilmington Trust had already exercised effective possession, custody and control over the Custodial Property for fifteen (15) months, without interference or interruption, and without accounting for its use, management care and disposition; and there was no apparent need or reason to appoint a receiver, other than to further Wilmington Trust's desire to insulate itself from the liabilities it had already assumed as a mortgagee in possession.

96.    To bolster its request for the appointment of a receiver for Custodial Property over which Wilmington Trust already exercised possession, custody and control, Wilmington Trust proffered a new "emergency" – alleging that the Debtor Properties would soon be without a property manager because BMG had given notice of termination of its services under the BMG Property Management Agreement.

97.    On information and belief, this alleged "emergency" was itself caused by Wilmington Trust, who either requested BMG to terminate its Management Agreement, or acted in such a manner that BMG was compelled to resign.

98.    At the same time, Wilmington Trust refused to consider anyone other than Paul/ ALPS to serve as receiver of the Custodial Property, categorically rejecting requests by Khawaja and the Debtor to consider other, less expensive receivers or property managers with local capabilities.

99.    As a result, Defendants Paul and ALPS, doing business as "James Paul of the

ALPS Group," were appointed Receiver of the Custodial Property, including (i) of the two

Philadelphia County Properties and related leases and rents, by Order of the Court of Common

Pleas in the Philadelphia County Foreclosure dated March 10, 2023 (the "Philadelphia Order");

and (ii) of the eleven Delaware County Properties and related leases and rents by Stipulated

Order in the Delaware County Court of Common Pleas in the Delaware County Foreclosure

dated March 18, 2023 (the "Delaware County Order").  Copies of the two referenced Orders are

attached hereto as Exhibits "M" and "N," respectively, and referred to herein as the, "Receiver

Orders."

100.    The result of Wilmington Trust's intransigent insistence on the appointment of

Defendants Paul and ALPS as Receiver would prove disastrous for the Custodial Property, as the

expense of property management would explode under Paul and ALPS, and the Custodial

Property itself would suffer substantial damages from gross mismanagement and waste in the

possession of these Defendants.

101.    The signs of the coming disaster were immediately evident:

a.    Despite the express requirement of monthly accountings in both Receiver

Orders (Philadelphia Order, ¶16; and Delaware County Order, ¶19), the

Receiver has never filed anything approaching an "accounting," relying

instead on informal reports (the "Receiver Reports").

b.    During their fifteen months of possession of the Custodial Property,

Defendants Paul and ALPS would provide only four reports on the

Philadelphia Properties and five on the Delaware County Properties.

c.  The Receiver Reports that were provided were replete with inconsistencies and irreconcilable numbers, and provided no documentation other than ALPS' own in-house invoices.

d.  The initial Receiver Reports described numerous repairs needed to various Debtor Properties.  Subsequent reports largely repeated the same information – suggesting that substantial repairs were being left undone.

e.  The Delaware County Order required an "Initial Budget" to be filed within sixty (60) days of the Order, with estimated expenditures for the succeeding twelve (12) months.  No budget was ever submitted.

f.  The Delaware County Order required that the Receiver provide, within sixty (60) days, an accounting of rents turned over by BMG along with an evaluation and recommendation of the compensation claimed due to BMG. No accounting of rents from BMG, or evaluation of BMG's compensation was provided.

g.  The Receiver Reports reflected charges for "set up fees" incurred by Defendants Paul and ALPS prior to the entry of the Orders.

h.  The Receiver Reports revealed that, in addition to "Receiver fees" of $250.00 an hour, ALPS was invoicing for "property management fees," "accounting fees" and various maintenance and repair expenses, without identifying any third-party vendor or receipts for such expenses.

i.  On information and belief, there were no third-party vendors because Defendant Paul was using ALPS' in-house departments to provide such services – in effect self-dealing, at enormous expense to the parties in interest.

The impact of ALPS Receiver fees and property management fees alone was alarming – they would average $3,087.38 a month, as compared to the approximately $750 a month average while BMG managed the properties.

102.    In and after June of 2022, Khawaja, through his counsel, repeatedly brought such concerns to the attention of Wilmington Trust and the Receiver, through their respective counsel.

103.    The Receiver dismissed these concerns; and Wilmington Trust did nothing at all.

104.    As a result, the expenses of the Receiver continued to mount, eventually (as described below) consuming the rents on the Debtor Properties, which also declined sharply during the possession, custody and control of Defendants Paul and ALPS, leaving no funds to maintain and repair the Debtor Properties or reduce the indebtedness on the Loan.

105.    At the same time, having secured the appointment of its Receiver, Wilmington Trust did nothing else to prosecute the Foreclosure Actions.

106.    Indeed, on April 20, 2022 – approximately a month after the Receiver Orders were entered, counsel for Wilmington Trust advised the Debtor and Khawaja's counsel not to answer the Foreclosure Complaints, because Wilmington Trust intended to amend them.

107.    Seven months later, when the Debtor filed the instant Bankruptcy Case, no Amended Complaint had been filed, and absolutely nothing was being done to advance the Foreclosure Actions.

**5. Khawaja's pre-petition efforts to resolve the Loan are frustrated by Wilmington Trust.**

108.    On June 7, 2022, Khawaja and Breen entered into a Settlement Agreement and Mutual Release (the "Breen-Khawaja Settlement Agreement"), settling various claims between them and providing, *inter alia*, for the transfer of ownership and control of Asset Management,

the Debtor's managing member, and the transfer of all offices previously held by Breen, to Khawaja.

109.     The Breen-Khawaja Settlement was subject to approval of this Court in the Khawaja Bankruptcy Case and a bankruptcy case filed in this Court by Breen on October 31, 2021, Case No. 19-15430-mdc (the "Breen Bankruptcy Case").

110.     On June 30, 2022 this Court entered Orders in the Khawaja Bankruptcy Case and the Breen Bankruptcy Case, approving the Breen-Khawaja Settlement Agreement, and the transfer of interests and management of Asset Management and the Debtor to Khawaja became effective as of July 22, 2022.

111.     Before and after July 22, 2022, Khawaja tried repeatedly to engage Wilmington Trust in discussion of an amicable resolution of the Loan, including the sale or refinance of the Debtor Properties.

112.     To this end, Khawaja (through his counsel) sought payoff statements from Wilmington Trust and made and solicited several settlement proposals.

113.     Khawaja's settlement efforts were frustrated by the same intransigence met previously with regard to the selection of a receiver for the properties: Wilmington Trust responded early on that it expected to be paid every dollar it was owed, and failed to provide any other response until after the instant Bankruptcy Case was filed.

114.     At the same time, Khawaja and his counsel could not secure a definitive payoff statement from Wilmington Trust that could be used to explore sale or refinancing of the properties to resolve the Loan.

115.     Every payoff statement provided by Wilmington Trust continued to accrue huge sums based on its enforcement of the non-monetary default of the Khawaja Bankruptcy.

116.    For the reasons set forth above, the enforcement of that default was improper and the sums claimed were the product of Wilmington Trust's own breaches of the Loan agreement and applicable law in enforcing them.

117.    In addition, the payoff amounts demanded numerous items that were separately improper, unsubstantiated or insufficiently explained.

118.    Finally, in addition to and apart from all of the foregoing, the payoff demands were so incomplete, indefinite and confusing that they could not be used to evaluate the possibilities of a sale or refinance of the Debtor Properties to resolve the Loan.

119.    An example of these issues is the payoff statement provided to counsel for the Debtor by counsel to Wilmington Trust setting forth amounts claimed due as of August 17, 2022 (the "August 17, 2022 Payoff Statement") a copy of which is attached hereto as Exhibit "O."

120.    In addition to accruing amounts claimed based on the improper enforcement of the alleged default of the Khawaja Bankruptcy filing, the August 17, 2022 Payoff Statement carried numerous specific items that were separately improper, unsubstantiated or insufficiently explained, such as:

    a.   Default Interest in the amount of $236,863.05 could not be reconciled with the $196,157.48 claimed for non-default Interest (the Loan Agreement provides for Default Interest of 5% in addition to the regular contract rate of 6.6%, and there is no explanation for the default portion to exceed the non-default portion).

    b.   A Late Charge Receivable of $27,217.62 that appears on its face to be an arbitrary, excessive and punitive charge, in the absence of any late payments

and without relation to any actual or fair estimate of the cost of processing late

payments or other actual costs.

c.  A revived "Prepayment Premium" of $216,101.59, that is explained nowhere,

but appears to rely on the "Yield Maintenance Premium" provisions of the

Loan Agreement, improperly asserted here in the absence of any prepayment,

voluntary or otherwise.

d.  A revived "Special Servicing Fee" of $24,000 that was not authorized by the

Loan Agreement, and is believed to be an arbitrary attempt of the Servicer,

Midland, to use alleged event of default to leverage additional compensation

for itself.

e.  Numerous, charges for "Protective Advances," including (without limitation)

a charge of $149,312.48 for "Protective Advance- Legal" without any

supporting detail, explanation or verification.

121.   In addition, the payoff statements provided always included qualifications that

rendered them confusing, indefinite and unreliable for the purposes of exploring settlement, sale

or refinance of the Debtor Properties.

122.   The August 17, 2022 Payoff Statement from Wilmington Trust exemplifies this

problem:

a.  It was provided by counsel to Wilmington Trust by email on August 25, 2022,

but states on its face that it expired on August 17, 2022, and provided no per

diem accruals from which the Debtor, or potential lender or investor, could

reliably estimate the current or future payoff amount.

    b.  It states that it includes interest accrued through August 31, 2022, but does

        account for any interest paid from rents collected during the Custodial

        Period.

    c.  It claims the right to add additional amounts not stated, including Legal fees

        and other 3rd-party fees that have been incurred but not invoiced or paid by the

        Lender..."

**6.  Post Petition Conduct of Wilmington Trust and Paul/ALPS.**

123.    Unable to make any progress on the resolution of the Wilmington Trust Loan, concerned about the mounting costs of the Receiver and the risk of damage to the Debtor Properties due to mismanagement by Defendants, and believing it was imperative that the properties be sold before their continued deterioration and changes in the real estate market resulted in further loss, the Debtor filed the instant Bankruptcy Case to use the Bankruptcy Code to recover possession of the properties and proceed with their prompt sale or refinance under a confirmed plan.

124.    Consistent with these objectives, the Debtor would eventually file a proposed Plan of Reorganization [Bankruptcy Docket No. 87] providing for the marketing and sale of the Debtor Properties through a broker, over the course of a year, but that goal was frustrated by the conduct of Defendants Wilmington Trust, Paul and ALPS, who collectively opposed and resisted the return of the Custodial Property for seven months, without good cause, while allowing the Debtor Properties to deteriorate further, eventually requiring their more immediate sale outside of a confirmed plan of reorganization.

125.    As of the Petition Date, Defendants Paul and ALPS were custodians (as defined under Bankruptcy Code §101(11)) of the Custodial Property.

126.    Despite receiving immediate notice of the filing of this Bankruptcy Case, these
Defendants failed and refused to comply with Bankruptcy Code §543(b), requiring the turnover
of such property to the Debtor and the filing of an accounting for such property.

127.    As of January 2, 2023, and despite repeated, written demand to Defendant Paul,
these Defendants continued to fail and refuse to turnover the Debtor Properties, leases or rents,
or account for such property in violation of Bankruptcy Code §543(b).

128.    Accordingly, on January 2, 2023, Debtor filed a Motion for Order Compelling
James Paul of ALPS Group, LLC and Agents to Comply with Bankruptcy Code § 543(b) (11
U.S.C. § 543(b)) (the "Turnover Motion") [Bankruptcy Docket No. 31] seeking an Order
compelling compliance with the turnover and accounting provisions of Bankruptcy Code
§543(b).

129.    Defendants Paul and ALPS not only continued to fail and refuse to comply with
Bankruptcy Code § 543(b), but failed to respond at all the Turnover Motion or seek any
authorization from this Court to continue as a custodian of the Custodial Property.

130.    Defendant Wilmington Trust, meanwhile, actively opposed the Turnover Motion,
thereby aiding and abetting the unauthorized custody and operation of the Custodial Property, for
another six months -- until June 13, 2023, when the Court entered an Agreed Order Regarding
Motion of Debtor for Order Compelling James Paul of ALPS Group, LLC and Agents to Comply
with Bankruptcy Code § 543(b) (11 U.S.C. § 543(b)) [Bankruptcy Docket No.109] (herein the
"June 13, 2023 Order").

131.    On information and belief, Defendants Paul and ALPS were not acting as neutral
or independent custodians in their failure and refusal to comply with Bankruptcy Code §543(b),

but were acting in concert with, under the direction and influence of and/or as an agent of

Defendant Wilmington Trust.  Among other indications of this concerted action and agency:

    a.   The conduct and statements of Defendants Paul/ALPS, including the statements of their counsel in a telephonic hearing concerning the Turnover Motion on May 31, 2023, clearly support the conclusion that these Defendants were relying on Wilmington Trust's opposition to the Turnover Motion in continuing to refuse to comply with the provisions of Bankruptcy Code § 543(b);

    b.   Defendant Wilmington Trust has objected to Debtor's discovery in this case concerning communications between Wilmington Trust and Defendants Paul and ALPS, asserting that such communications are privileged attorney work product; and

    c.   On August 30, 2023, Defendants Paul and ALPS filed a Motion in the State Court Philadelphia County Foreclosure Action (the "August 30, 2023 Fee Allowance Motion"), seeking allowance of expenses and fees for their services as Receiver/Custodian both before and after the Petition Date in this Bankruptcy Case, and indicating an expectation of payment for such services by Wilmington Trust.  A true and correct copy of the referenced August 30, 2023 Fee Allowance Motion is attached hereto as Exhibit "O."

132.    Accordingly, Debtor believes and avers that on and after the Petition Date, if not before, Wilmington Trust exercised a degree of control and influence over the use, management, care and disposition of the Custodial Property by Defendants Paul and ALPS, so as to warrant a

finding that Defendant Wilmington Trust itself continued to exercise effective possession and control of the assets through and including June 13, 2023.

133.    During this time between the Petition Date and June 13, 2023, Defendants Paul and ALPS continued to control and manage the Custodial Property, collect and use rents, and engage in other acts of control over property of the Debtor, without any authorization from this Court, in violation of prohibitions on such transactions under Bankruptcy Code §543(a) as well as the automatic stay under Bankruptcy Code §362(a).

134.    When Defendants Paul and ALPS finally returned possession of the Custodial Property to the Debtor pursuant to this Court's June 13, 2023 Order:

      a.   half of the units were vacant, with three of the vacant units occupied by squatters;

      b.   $54,200 in rents were reported past-due and uncollected by Defendants Paul and ALPS;

      c.   no rental licenses were in place for the properties;

      d.   there were some $41,757.83 in delinquent real estate taxes and utilities owed on the properties;

      e.   deplorable and unhealthy conditions existed at many of the properties; and

      f.   only $25,078.83 in net rents remained to operate the properties.

135.    The condition of the Custodial Property was so grave, that the Debtor was forced to abandon its plans to maintain and operate the Debtor Properties for up to a year while marketing them for sale, as it was now urgent that the properties be sold as soon as possible to avoid their continued deterioration in value, the continued accumulation of debts and increased risk of liability in their operation.

136.    Accordingly, on June 7, 2023, the Debtor accepted the offer of Moses Charles to purchase the entire portfolio of thirteen properties, for the gross sum of $1,750,000, and filed its Motion of Debtor for Sale of Real Property [etc.] ("Sale Motion") [Bankruptcy Docket No. 118].

137.    On July 6, 2023, Defendant Wilmington Trust objected to the Sale Motion, by its Objection to Motion of Debtor for Sale of Real Property [etc.] (the "Wilmington Trust Objection to Sale") [Bankruptcy Docket No. 126].

138.    Expert appraisals prepared for the Debtor by Ettore Petrone ("Petrone") as of September 2022, had valued the Debtor Properties at $2,192,000; but re-appraisal of the Debtor Properties by Petrone as of July 2023, concluded they were then worth $1,757,000 – reflecting a decline in value of $435,000 in those last ten months of the Custodial Period.

139.    Expert reports prepared by Alliance Adjustment Group ("AAG") in July of 2023, found $724,428.09 in repairs were needed to restore 12 of the 13 Debtor Properties to rent ready condition. One property occupied by squatters could not be inspected at the time but was later found to need an additional $65,577.39 in repairs, for a total estimate of $790,005.48 for repairs needed to restore all 13 properties.

140.    The updated Petrone appraisals and AAG repair estimates clearly supported the sale of the Debtor Properties for $1,750,000.

141.    Despite this, Wilmington Trust persisted in objecting to the Sale Motion, requiring an evidentiary hearing before this Court.

142.    On August 16, 2023, after a three-day evidentiary hearing, this Court entered an Order (the "Order Approving Sale") [Bankruptcy Docket No. 145], granting the Sale Motion and approving the sale of the Debtor Properties.

143.     Settlement on the sale of the Debtor Properties occurred on August 31, 2023, with net sale proceeds of $1,706,715,53 (the "Net Sale Proceeds") being held by Horizon Title Company ("Horizon"), pursuant to paragraph 11 of the Order Approving Sale.

144.     In the meantime, Paul/ALPS have failed to account as required by Bankruptcy Code §543(b)(2) and Bankruptcy Rule 6002, as specifically ordered by this Court in paragraph 1.g of the June 13, 2023 Order.

145.     In continuing disregard of their obligations under the Bankruptcy Code and this Court's Order of June 13, 2023, and in further violation of the automatic stay under Bankruptcy Code §362(a), Defendants Paul and ALPS, doing business as James Paul of the ALPS Group, filed their August 30, 2023 Fee Allowance Motion (Exhibit "O" hereto) in the Philadelphia County Foreclosure Action.

### 7.   Need for Accountings from the Defendants.

146.     As set forth above, each of the Defendants were, during all or a portion of the Custodial Period, in possession, custody or control of the Custodial Property.

147.     As a result, each of the Defendants owed fiduciary duties to the Debtor and/or its bankruptcy estate: (i) to manage, operate, lease, protect, preserve, repair, maintain and care for the Custodial Property as would an owner of such property; (ii) to diligently collect the rents owed on the Debtor Properties for application to their operation, repair, maintenance and care, and/or to the reduction of the indebtedness on the Wilmington Trust Loan; and to refrain from acts and omission constituting waste.

148.     Each of the Defendants have a duty to account as fiduciaries for their use, management, care and disposition of the Custodial Property, jointly and severally with other Defendants in possession, custody or control during the Custodial Period.

149.    Defendant Wilmington Trust is additionally obligated to account for the charges and accruals on the Loan and to apply and account for the application of rents to the care of the properties and/or the indebtedness on the Loan.

150.    Defendants Paul and ALPS are additionally obligated to account pursuant to Bankruptcy Code §543(b)(2) and Bankruptcy Rule 6002, and were specifically ordered to do so under paragraph 1.g of this Court's June 13, 2023 Order.

151.    None of the Defendants have accounted for their administration of the Custodial Property during the Custodial Period.

152.    The need for an accounting is further supported by the compelling evidence of gross mismanagement and waste by one or more of Defendants, including the following:

    a.  Based on the performance of the Debtor Properties in the 14 months prior to the Custodial Period, the Debtor conservatively estimates that, had the properties continued to be reasonably managed and cared for, there should have been at least $305,000 in net rents (after payment of the expenses of management, operation and care of the properties) to be applied to the indebtedness on the Loan or turned over to the Debtor.  To date, Wilmington Trust has applied no rents to the indebtedness and only $25,078.83 in rents were turned over by Paul/ALPS at the end of the Custodial Period.

    b.  In the 14 months prior to the Custodial Period, when BMG managed the Debtor Properties under the direction and control of the Debtor, BMG reported spending approximately $21,546 for maintenance and repair of the properties.  In the first 17 months of the Custodial Period, when BMG managed the properties under the direction and control of Wilmington Trust,

36

the expenditures reported by BMG for maintenance and repair appear to have
skyrocketed to approximately $131,932.

c.  Despite this massive increase in expenditures for maintenance and repair of
the Debtor Properties during the first 17 months of the Custodial Period,
Defendants Paul and ALPS reported the properties were already in disrepair
when they assumed possession and control in March of 2022.

d.  Defendants Paul and ALPS appear to have done little or nothing to maintain,
repair or lease the Debtor Properties in the 16 months they had possession, yet
charged $40,135 in management fees, in addition to $48,437 in Receiver fees
– more than 7 times the monthly expense of prior management under BMG.

e.  Another $40,575 charged or claimed as expenses during the administration of
the Custodial Property by Defendants Paul and ALPS, appears to be for
payments made or amounts claimed by ALPS that were not specifically
authorized by the State Courts or this Court.  Such transactions are, under
applicable law, presumed invalid, fraudulent and inequitable, and to be
avoided and/or returned to the Debtor unless and until proven fair, reasonable
and properly authorized.

f.  The grave condition of the Custodial Property upon its return to the Debtor
(see paragraph 133, above), the precipitous ($435,000) decline in value of the
Debtor Properties in the last 10 months of the Custodial Period as evidenced
by the Petrone appraisals, and the substantial ($790,005.48) cost of needed
repairs estimated in the AAG reports in July of 2023, all demonstrate that the
Custodial Property was seriously mismanaged and neglected, resulting in

waste while in the possession, custody and control of Defendants Paul and

ALPS – including during the last 7 months when these Defendants, aided and

abetted by Defendant Wilmington Trust, exercised that possession, custody

and control in continuing violation of the turnover and accounting

requirements of Bankruptcy Code §543(b) and the automatic stay in

Bankruptcy Code §362(a).

153.    Plaintiff believes and avers that $1,055,000 is a conservative estimate of the

unaccounted for asset value loss suffered by the Custodial Property during the Custodial Period,

based on the above estimate of $305,000 for the unaccounted for net rents plus $700,000 – the

latter figure being the difference between (i) the $1,750,000 the Debtor Properties sold for and

(ii) Plaintiff's conservative estimate of what the Debtor Properties would have been worth if

properly maintained during the Custodial Period.

**IV.    CLAIMS FOR RELIEF**

**COUNT I:**
**Accounting from all Defendants.**

154.    Plaintiff repeats and re-alleges each of the preceding paragraphs of this Complaint

as if set forth at length herein.

155.    As set forth above, during some or all of the Custodial Period, each of the

Defendants exercised actual or effective possession, custody and control over the Custodial

Property – including the Debtor Properties, and leases and rents relating to same.

156.    Each of the Defendants owed fiduciary duties to the Debtor and/or its bankruptcy

estate, to manage, operate, protect, preserve, repair, maintain and care for the Custodial Property

as would an owner of such properties; to diligently collect and apply the rents owed on such

properties to their repair, maintenance and care; and to refrain from acts and omissions constituting waste.

157.    Defendants are each obligated, jointly and severally with other Defendants in actual or effective possession, custody and control of the Custodial Property, to account for the use, management, care and disposition of such property, and are liable for any damage or waste occurring during their actual or effective possession and control.

158.    No Defendant has accounted for the use, management, care and disposition of the Custodial Property during the Custodial Period.

159.    Plaintiff is in need of a full and complete accounting from the Defendants, to fully understand what occurred in the use, management, care,  and disposition of the Custodial Property, and to determine the full extent of damage or waste caused and parties liable therefore.

160.    The Defendants, by virtue of their possession and control of the Custodial Property during all or part of the Custodial Period, are uniquely capable of so accounting.

161.    The Custodial Period to be accounted is long (925 days) and involves sub-periods of joint, and overlapping possession and control by the Defendants, further complicating the accounting and warranting the imposition of joint and several liability of the Defendants to account in equity.

162.    As a result, the issues to be addressed in a full and proper accounting of the use, management, care, and disposition of the Custodial Preoprty are numerous and complicated, and obtaining a full and adequate account and reliance on discovery on legal claims will cause unreasonable expense to the Debtor to complete a task that the Defendants were themselves obligated to perform as part of their fiduciary obligations to Plaintiff/Debtor before and during the Bankruptcy Case.

163.    The accounting is itself a core matter under 28 U.S.C. §157(b)(2) (A), (C) and (O)

and is likely to have a material effect on the determination of other core matters under 28 U.S.C.

§157(b)(2), given (*inter alia*), the following:

a.    The Custodial Period continued for approximately seven (7) months during

the pendency of this Bankruptcy Case and includes another eleven (11)

months of unaccounted for possession and control during the first, 2021

MBMK Bankruptcy;

b.    The accounting period includes time during the pendency of this Bankruptcy

Case, from November 21, 2022 through June 13, 2023, during which time

Defendants Paul and ALPS, with the aid and support of Defendant

Wilmington Trust, continued to exercise possession and control in violation of

the turnover provisions of Bankruptcy Code §543(b) and the automatic stay

under Bankruptcy Code §362(a);

c.    The accounting by Defendants Paul and ALPS was expressly required by

Bankruptcy Code §543(b) and paragraph 1.g of this Court's June 13, 2023

Order; and

d.    The accounting will materially affect the outcome of other core matters in this

Bankruptcy Case, including (without limitation) the pending Objection to

Proof of Claim No. 15-1, the claims in Counts II through V of this Complaint

and other possible core claims that may be revealed in a full and complete

accounting.

164.    As such, the accounting sought herein is properly required within the equitable

jurisdiction of this Court, under Bankruptcy Code §105 and in accordance the requirements of

Bankruptcy Code §543(b), Bankruptcy Rule 6002, and generally applicable law governing fiduciary accounts.

165.    Consistent with the foregoing, the Defendants should be ordered, jointly and severally, to provide a complete and detailed accounting of their collective administration of the Custodial Property during the Custodial Period, including the following, verified under oath:

    a.   an inventory and valuation of the Custodial Property in the possession and control of any Defendant at the beginning of the Custodial Period;

    b.   an account of all rents and other income received, disbursements made, losses or damages incurred and other material transactions affecting the Custodial Property during the Custodial Period;

    c.   an inventory and valuation of the Custodial Property in the possession and control of any Defendant at the end of the Custodial Period;

    d.   such other information as necessary to explain any loss, damage or diminution in the value of any Custodial Property during the Custodial Period; and

    e.   documentation of the foregoing (including vouchers, receipts, payroll records, bank statements and similar records) as is customarily provided in support of fiduciary accounts;

all the foregoing to be filed with and subject to examination before this Court, including the Debtor's right to take exception to such accounts, request disallowance of claims and compensation, seek avoidance of improper transfers, recover of damages for mismanagement, neglect or waste, surcharge the Defendants, or seek other appropriate relief from this Court.

WHEREFORE, Plaintiff requests an order: (i) directing Defendants Wilmington Trust, BMG, Paul and ALPS, jointly and severally, to provide a full and complete accounting in

accordance with the foregoing; (ii) allowing Debtor examination and discovery on matters relevant to such account; (iii) allowing for the amendment of this Complaint to plead additional claims and facts as may be warranted by discovery and/or the results of such account; (iv) entering judgment against such Defendants, to the extent such Defendants are unable to properly or fully account; (v) awarding costs of suit; and (vi) granting such additional relief as may be deemed equitable and just.

## COUNT II:
### Breach of Contract vs. Defendant Wilmington Trust

166.    Plaintiff repeats and re-alleges each of the preceding paragraphs of this Complaint as if set forth at length herein.

167.    This Count II asserts claims against Defendant Wilmington Trust for declaratory relief and damages relating to this Defendant's improper declaration of default, enforcement and exercise of remedies under the Loan Documents.

168.    As alleged above, beginning with the issuance of the January 9, 2020 Notice (Exhibit "J" hereto), Defendant Wilmington Trust engaged in a series of confused, contradictory, overreaching and improper actions that were, separately and collectively, in breach of the Loan Documents and applicable law. These actions, described in more detail in paragraphs 40 through 65 of this Complaint, included:

  a.    Declaring an Event of Default on January 9, 2020 based on the Khawaja Bankruptcy filing of August 30, 2019, after waiving the default by its conduct and statements over the course of five months;

  b.    Exercising remedies for the enforcement of that alleged Event of Default in violation of the laws of the State of New York, applicable under Section 9.20 of the Loan Agreement, restricting the enforcement of non-monetary defaults,

and in violation of the implied covenant of good faith and fair dealing

applicable under the laws of New York and Pennsylvania; and

c.  Compounding these breaches of the Loan Agreement by using the waived and

immaterial, non-monetary alleged default of the Khawaja Bankruptcy filing as

a pretense for imposing new, unwarranted and oppressive demands that

Wilmington Trust knew or should have known the Debtor was incapable of

performing, thereby depriving the Debtor of the ability to continue payment of

the Loan on regular terms.

169.    The alleged Event of Default of the Khawaja Bankruptcy filing, and all actions

taken in reliance thereon, including all demands for additional or accelerated loan payments, late

charges, default interest and accelerated payments, were themselves invalid and in material

breach of the Loan Agreement.

170.    Wilmington Trust's demands were not only in material breach of the Loan

Agreement, but compliance with them was both impractical and futile, warranting Plaintiff's

suspension of payments in and after February 2020.

171.    As alleged above, Wilmington Trust further compounded the foregoing breaches

of the Loan Agreement by its continued reliance on same in the exercise of additional and

increasingly drastic remedies under the Loan Documents, including:

a.  On November 30, 2020, acting under the Second Assignment of Management

Agreement and Assignment of Rents to take possession and control of the

Custodial Property, using Defendant BMG as its agent;

b.  In December of 2020, Commencing the Foreclosure Actions in the

Philadelphia and Delaware County Courts;

    c.   Securing the appointment of Defendants Paul and ALPS as Receiver in March
of 2022, to replace BMG as its agent and custodian of the Custodial Property;

    d.   Filing its Proof of Claim No. 15-1 in the instant Bankruptcy Case, claiming in
addition to the principal and interest on the Loan, substantial, additional
amounts for Default Interest, Late Charges, Special Servicing Fees,
Prepayment Penalty and Attorneys' Fees;

    e.   Asserting ownership of the rents from the Debtor Properties based on its
prepetition actions taking possession of same through BMG on November 30,
2020;

    f.   Objecting to Debtor's Turnover Motion in this case; and

    g.   Objecting to the Debtor's Sale Motion in this case.

172.   The exercise of such remedies could only be proper if authorized by a valid and
enforceable Event of Default under Loan Agreement.

173.   As set forth above, there was no valid and enforceable Event of Default to support
the exercise of such remedies.

174.   To the contrary, the exercise of these remedies was barred by the prior, material
superseding and continuing breaches of the Loan Documents by Wilmington Trust, as described
elsewhere in this Complaint.

175.   As a direct and proximate result of the foregoing breaches of the Loan Documents
by Wilmington Trust, the Plaintiff has suffered damages, including:

    a.   Deprivation of the Plaintiff's rights to use, sell or refinance the Debtor
Properties in the ordinary course, and in accordance with the terms of the

Loan Documents in the absence of a declared default and enforcement
actions;

b.  Damage to the Plaintiff's credit and reputation due to the improper declaration
of default and enforcement actions;

c.  Loss of income following the improper seizure of the Custodial Property;

d.  Interference with the Plaintiff's contractual relations with tenants and
prospective tenants following that seizure;

e.  Damage suffered by the Debtor Properties due to the disruption of cash flow,
mismanagement and waste following improper seizure of the Custodial
Property;

f.  Penalties and interest incurred due to the delay in payment of real estate taxes
and utilities on the Debtor Properties;

g.  The costs incurred by the Debtor in this Bankruptcy Case;

h.  Such other damage and loss as may be revealed in the accounting sought in
Count I, above, and discovery in this matter.

The nature and extent of the damages cannot be finally determined until completion of the

accounting sought in Count I of this Complaint, but based on the conservative estimate of

unaccounted for asset value loss described in paragraph 153 above, Plaintiff believes the

damages for the items described in paragraphs c., d., and e. above are likely to exceed

$1,055,000.

176.  Based on the foregoing, in addition to the award of damages and consistent with

the relief sought in the Debtor's pending Objection to Proof of Claim No. 15-1 [Bankruptcy

Docket No. 133], Plaintiff requests this Court declare the alleged Event of Default based on the

Khawaja Bankruptcy filing, and all fees and charges added thereafter to the principal and regular interest on the Loan, to the extent based on the existence of a default, invalid, null and void; reduce the balance on Loan to be allowed on Wilmington Trust's Proof of Claim No. 15-1, to the total sum of $1,319,941.02, to be further reduced by the amount of damages awarded on this Count and subject to such other relief as may be granted in this action.

WHEREFORE, Plaintiff requests an order awarding judgment in its favor and against Defendant Wilmington Trust: (i) for damages as described above; (ii) declaring the amount due on the Loan consistent with the foregoing and the relief sought in the Debtor's Objection to Proof of Claim No. 15-1; (iii) allowing for the amendment of this Count to plead additional claims and facts as may be warranted by discovery and/or the results of such account; (v) awarding costs of suit; and (vi) granting such additional relief as may be deemed equitable and just.

## COUNT III:
### Breach of Fiduciary Duty and Waste vs. All Defendants

177.    Plaintiff repeats and re-alleges each of the preceding paragraphs of this Complaint as if set forth at length herein.

178.    This Count III asserts claims against Defendants Wilmington Trust, BMG, Paul and ALPS for damages for breach of fiduciary duties, including waste, in their use, management, care and disposition of the Custodial Property during the Custodial Period.

179.    The claims asserted herein are in addition and/or in the alterative to the claims asserted in Count II against Defendant Wilmington Trust in that they are based on the fiduciary duties of this and other Defendants arising out of their possession, custody and control of the Custodial Property and do not depend on a finding that the alleged Events of Default was invalid or unenforceable in the first place.

180.    As set forth above, each of the Defendants exercised actual or effective possession, custody and control over the Custodial Property during some part of the Custodial Period.

181.    As such, each Defendant owed fiduciary duties to the Plaintiff and/or its bankruptcy estate, to competently manage, operate, protect, preserve, repair, maintain and care for the Custodial Property as would an owner of such properties; to diligently collect and apply the rents owed on such properties to their repair, maintenance and care; and to refrain from acts and omissions constituting waste.

182.    As set forth above (including in paragraphs 134 – 139 and 152 of this Complaint, above), there is compelling evidence of the Defendants' breach of their fiduciary duties, including gross mismanagement and waste in their individual and collective use, management, care and disposition of the Custodial Property during the Custodial Period.

183.    The full nature and extent of the Defendants' breaches of these fiduciary duties, mismanagement and waste, and the damages resulting from same, cannot be known until the Defendants have fully accounted for their use, management care and disposition of the Custodial Property during the Custodial Period; however, such damages are conservatively estimated herein, and pending a full accounting are justly presumed to be, in the amount of at least the $1,055,000 unaccounted for asset value loss described in paragraph 153 above.

184.    It is believed and averred, based on the same evidence and pending a full accounting, that some portion of that loss occurred as the result of mismanagement or waste during each Defendant's possession, custody and control of the Custodial Property, rendering them justly liable for such loss.

185.    It is believed and averred, however, that Defendant Wilmington Trust is justly held jointly liable for the entire loss caused by any breach of fiduciary duty, mismanagement and waste occurring during the possession, custody and control of the other Defendants, based on the following:

     a.    As set forth above, Defendant Wilmington Trust was the cause-in-fact of all the damage that occurred to the Custodial Property during Custodial Period, having initially seized effective possession, custody and control of the Custodial Property, through Defendant BMG as its agent, on November 30, 2020, and having insisted specifically on the replacement of BMG by Defendants Paul and ALPS by the State Courts;

     b.    As set forth above, Defendant BMG acted as agent of Wilmington Trust during Custodial Period;

     c.    As set forth above, (including in paragraphs 129 - 132 of this Complaint), it is believed and averred that Wilmington Trust exercised effective influence and control over, acted in concert with, and aided and abetted Defendants Paul and ALPS, both before and after the filing of the Bankruptcy Petition in this case.

186.    Based on the foregoing, it is believed and averred that Defendant Wilmington Trust is justly deemed jointly and severally liable for all breaches of fiduciary duty, mismanagement and waste attributable to the other Defendants herein on principles of agency, concerted action and/or aiding and abetting.

187.    Defendants' breaches of their fiduciary duties were willful, malicious and in callous disregard for the interests of Plaintiff and its bankruptcy estate, warranting the imposition of punitive damages against each of the Defendants.

188.    The cause for punitive damages is warranted not only by the callous and arrogant

disregard of the interests of Plaintiff but also for the outrageous disregard for the tenants and the

public, in neglecting such basic public duties as the securing of proper rental licenses, the timely

payment of local taxes and fees and prioritizing the payment of grossly excessive fees to Pual

and ALPS while subjecting tenants and neighborhoods to unsightly and potentially unsafe

conditions and squatters in these properties.

WHEREFORE, Plaintiff requests this Court (i) enter judgment against each of the

Defendants, and against Defendant Wilmington Trust, jointly and severally Defendants BMG,

Paul and ALPS, for the damages proximately caused by their breaches of fiduciary duty,

mismanagement and waste, together with punitive damages and costs of suit; (ii) offset any

damages awarded against Defendant Wilmington Trust against its Proof of Claim No. 15-1 and

reducing that claim in accordance with the Debtor's Objection thereto; (iii) allow for the

amendment of this Count to plead additional claims and facts as may be warranted by discovery

and/or the results of the accounting sought in Count I of this Complaint; and (iv) grant such

additional relief as may be deemed equitable and just.

### COUNT IV:
**Violation of the Bankruptcy Code §§543(b) and 362(a) vs. Wilmington Trust,
James Paul and ALPS Group Inc.**

189.    Plaintiff repeats and re-alleges each of the preceding paragraphs of this Complaint

as if set forth at length herein.

190.    This Count IV asserts claims against Defendants Wilmington Trust, Paul and

ALPS for damages due to the continued exercise of possession and control over the Custodial

Property by Defendants Paul and ALPS after the Petition Date, without authorization by or

account to this Court as required by Bankruptcy Code §543(b), and in violation of the automatic stay under Bankruptcy Code §362(a).

191.    As set forth above (including in paragraphs 125 – 129) Defendants Paul and ALPS continued to exercise possession, custody and control over the Custodial Properties for approximately 7 months after the Petition Date, before this Court's June 13, 2023 Order directing these Defendants to deliver this property to the Debtor.

192.    As set forth above, these actions were in violation of the provisions of Bankruptcy Code §543(b), requiring defendants Paul and ALPS, as custodians of property of the Debtor to either turnover such property or request to be excused from doing so, and in either case to account to this Court for its administration of the Debtor's property.

193.    The obligations of Defendants Paul and ALPS to turn over such property under Section 543(b) were immediate and self-effectuating upon notice of the filing of the Bankruptcy Case and could be excused only by the presentation of a motion to this Court.

194.    Despite immediate notice of the filing of the Bankruptcy Case, Defendants Paul and ALPS failed and refused to turn over the Custodial Property, present a motion to be excused for doing so or account as required by Section 543(b).

195.    Defendants Paul and ALPS continued to fail and refuse to comply with Section 543(b) in any even after written demand by Debtor and even following the Debtor's filing of its Turnover Motion on January 2, 2023.

196.    Only Defendant Wilmington Trust responded to the Turnover Motion – opposing it by its own Objection to the Turnover Motion filed on January 17, 2023 [Bankruptcy Docket No. 42].

197.    While Wilmington Trust's Objection opposed the Turnover Motion, it did nothing

to address the lack of any authorization of Defendants Paul and ALPS to continue in possession,

custody and control or to account for their administration of the Debtor's property pending the

resolution of the Turnover Motion.

198.    Defendants Paul and ALPS later – in an appearance before this Court on January

20, 2023 – claimed to be relying on the Objection of Wilmington Trust, but continued to ignore

the need for authorization by and accounting to this Court for its possession, custody and control

of the Debtor's property.

199.    In the meantime, Defendants Paul and ALPS to exercise possession, custody and

control of the Debtor's property, but collected and expended rents, including (on information and

belief) for management fees paid to themselves, and for other amounts not authorized by this

Court and yet to be properly accounted for as required by Bankruptcy Code §543(b) and this

Court's Order of June 13, 2023.

200.    In addition, and as set forth above, (including the facts alleged in paragraphs 133-

143 and 152-153 of this Complaint), Plaintiff believes that substantial harm occurred to the

Custodial Properties during the 7 months of unauthorized use, possession and control of the

Custodial Property after the Petition Date.

201.    The continued exercise of possession and control of the Debtor Properties, and the

payment of amounts and incurring of charges for expenses, without any authorization or by this

Court, not only violates Section 543(b), but also violates the automatic stay under Bankruptcy

Code §362(a) (3) (prohibiting acts to obtain possession of property of the estate or of property

from the estate or to exercise control over property of the estate), and possibly other subsections

of section 362(a) as may be revealed by the accounting that remains due form these Defendants.

202.    As set forth above (including in paragraphs 129 - 132 of this Complaint), it is

believed and averred that Wilmington Trust also exercised effective influence and control over,

acted in concert with and aided and abetted Defendants Paul and ALPS in the continued exercise

of possession and control of the Custodial Property in violation of Bankruptcy Code §§543(b)

and 362(a).

203.    As a direct and proximate result of the Defendants' violations of Bankruptcy

Code §§543(b) and 362(a) the Debtor has suffered damage and loss including:

    a.   The direct damage and waste suffered by the Custodial Property due to its

        unauthorize use, mismanagement and neglect during the 7 months between

        the Petition Date and the June 13, 2023 Order;

    b.   Deprivation of the Debtor's right to use the Custodial Property and income

        therefrom during the Bankruptcy Case;

    c.   Interference with and damage to Debtor's contractual relations with tenants

        and prospective tenants;

    d.   Penalties and interest incurred due to the delay in payment of real estate taxes

        and utilities on the Debtor Properties;

    e.   Frustration and delay of the Debtor's efforts to sell the Debtor Properties

        pursuant to a Plan of Reorganization;

    f.   Such other damage and loss may be revealed in the accounting sought in

        Count I, above, and discovery in this matter.

204.    The above-referenced violations of Bankruptcy Code §§543(b) and 362(a) by

Defendants were willful, malicious and in callous disregard for the interests of the Debtor and its

bankruptcy estate, warranting the award of actual and punitive damages, attorneys fees and costs against the Defendants.

WHEREFORE, Plaintiff requests this Court (i) enter judgment against each of the Defendants Defendant Wilmington Trust, Paul and ALPS, jointly and severally, for the damages proximately caused by their violations of Bankruptcy Code §§543(b) and 362(a), together with punitive damages and costs of suit; (ii) offset any damages awarded against Defendant Wilmington Trust against its Proof of Claim No. 15-1 and reducing that claim in accordance with the Debtor's Objection thereto; (iii) allow for the amendment of this Count to plead additional claims and facts as may be warranted by discovery and/or the results of the accounting sought in Count I of this Complaint; and (iv) grant such additional relief as may be deemed equitable and just.

**COUNT V:**
**Equitable Subordination and Transfer of Lien of Wilmington Trust**
**to the Estate Pursuant to Bankruptcy Code §510(c)**

205.    Plaintiff repeats and re-alleges each of the preceding paragraphs of this Complaint as if set forth at length herein.

206.    This Count V asserts claims against Defendant Wilmington Trust for equitable subordination pursuant to Bankruptcy Code §510(c), in addition and in the alternative to the Claims set forth in Count II for breach of contract.

207.    Pursuant to Bankruptcy Code §510(c), this Court may, under principles of equitable subordination either:

      a.    Subordinate for purposes of distribution all or part of an allowed claim or interest to all or part of another claim or interest; or

      b.    Order any lien securing such subordinated claim be transferred to the estate.

208.    To the extent that, notwithstanding the claims asserted in Count II of this
Complaint, it is found that Defendant Wilmington Trust did not breach the Loan Documents or
that its enforcement of remedies for default are otherwise proper, such that all or any portion of
Wilmington Trust's Proof of Claim No-15 is deemed allowed, it is submitted that the actions of
Wilmington Trust set forth in this Complaint nonetheless constitute inequitable conduct that has
caused injury to other creditors or conferred an unfair advantage to Wilmington Trust,
warranting (i) the subordination of any allowed portion of its Proof of Claim No. 15-1 to all
unsecured priority and non-priority claims in this case and/or (ii) the transfer of the lien securing
its claim to the Debtor's estate to allow the use of property otherwise subject to its lien for the
payment of expenses of the estate.

209.    Equitable subordination as such is consistent with the Bankruptcy Code.

WHEREFORE, Plaintiff requests this Court enter an Order pursuant to Bankruptcy Code
§510(c) (i) subordinating any allowed portion of Wilmington Trusts Proof of Claim No. 15-1 to
all unsecured priority and non-priority claims in this case; (ii) the transferring the lien securing
such claim to the Debtor's estate to the extent of necessary to pay any allowed expenses of the
estate; and/or (iii) allowing such other relief as this Court deems just and proper.

Respectfully Submitted,

**FOEHL & EYRE, P.C.**

Dated: 9/18/2023                    BY: _____
                                         Robert B. Eyre, Esquire
                                         ATTORNEY I.D. #41990
                                         432 North Easton Rd.
                                         Glenside, PA 19038
                                         Phone: 610-566-5926
                                         Email: rob@foehllaw.com
                                         Attorneys for Debtor (Proposed)