**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| MBMK Property Holdings, LLC, | : | Bankruptcy No. 22-13121-MDC |
| Debtor. | : | |

| | | |
|---|---|---|
| MBMK Property Holdings, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Adversary No. 23-00062-MDC |
| Wilmington Trust, National Association, as Trustee | : | |
| for the Benefit of the Holders of CoreVest | : | |
| American Finance 2018-2 Trust Mortgage Pass- | : | |
| Through Certificates; Bay Management Group of | : | |
| Philadelphia, LLC; James Paul, d/b/a James Paul of | : | |
| ALPS Group; and ALPS Group, Inc. d/b/a James | : | |
| Paul The ALPS Group, | : | |
| Defendants. | : | |

# MEMORANDUM

## I.     INTRODUCTION

The debtor, MBMK Property Holdings, LLC (the "Debtor" or "Plaintiff"), has filed an adversary action (the "Adversary") against a number of defendants (collectively, the "Defendants").  As will be discussed in greater detail *infra,* the general basis for the Plaintiff's claims in the adversary action is the Defendants' alleged mismanagement and malfeasance with respect to thirteen properties the Debtor owned, but that became the subject of pre-petition state court receivership proceedings (the "Receivership").

The Complaint asserts five counts against some or all Defendants: Count I seeks an accounting from all Defendants; Count II asserts a breach of contract claim against Wilmington Trust, N.A. ("Wilmington Trust"); Count III asserts breach of fiduciary duty and waste claims against all Defendants; Count IV asserts a claim for violation of §§543(b) and 362(a) of the United States Bankruptcy Code, 11 U.S.C. §§101 *et seq.* (the "Bankruptcy Code"), against Wilmington Trust, James Paul and ALPS Group Inc. ("ALPS Group"); and Count V asserts an equitable subordination claim against Wilmington Trust under §510(c) of the Bankruptcy Code.

Pending before the Court are two separate motions to dismiss (the "Motions to Dismiss").[1] Defendant Wilmington Trust filed a motion to dismiss Counts I, II, IV, and V against it for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").[2] Defendant James Paul filed a motion to dismiss all claims against it for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)").[3] Plaintiff filed oppositions to each Motion to Dismiss (the "Oppositions"),[4] and Wilmington Trust and James Paul each filed a reply (the "Replies").[5] The Court held a hearing (the "Hearing") on the Motions to Dismiss, Oppositions, and Replies on January 26, 2024, after which it took the matter under advisement.[6]

---

[1] Defendant Bay Management Group of Philadelphia, LLC ("BMG") filed an Answer to the Complaint.

[2] Adv. Pro. Docket No. 13.  Federal Rule of Civil Procedure 12(b) is made applicable to the Adversary pursuant to Federal Rule of Bankruptcy Procedure 7012(b).

[3] Adv. Pro. Docket No. 14.

[4] Adv. Pro. Docket Nos. 29, 35.

[5] Adv. Pro. Docket Nos. 36, 37.

[6] The Court pauses here to address, but not resolve, a perplexing issue that arose at the Hearing.  ALPS Group filed a motion to adopt James Paul's Motion to Dismiss (the "Motion to Adopt").  Adv. Pro. Docket No. 20.  Plaintiff objected to the Motion to Adopt, *see* Adv. Pro. Docket No. 30, but after a hearing the Court ultimately granted the Motion to Adopt on January 19, 2024.  Adv. Pro. Docket No. 44.  However, at the subsequent Hearing on the Motions to Dismiss on January 26, 2024, counsel who appeared on behalf of ALPS Group and filed the Motion to

For the reasons discussed *infra*, the Court will grant both Motions to Dismiss in part and deny them in part.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[7]

### A.    The Debtor's Business and Financing Received from Wilmington Trust

The Debtor is a Delaware limited liability company formed in August 2018 by Mohsin Khawaja ("Mr. Khawaja") and Matthew Breen ("Mr. Breen").  Complaint at ¶¶1, 23.  The Debtor owned thirteen residential rental properties, acquired in September 2018, located in Philadelphia and Delaware County, Pennsylvania (together with the attributable leases and rental income derived therefrom, the "Properties").  Id. at ¶¶1, 3, 28.  Prior to the Debtor acquiring the Properties, Mr. Khawaja and his family owned twelve of them and Mr. Breen owned one.  Id. at ¶24.  At the same time the Debtor was formed, Mr. Khawaja and Mr. Breen formed MBMK Asset Management, LLC ("Asset Management LLC"), with that entity serving as the sole member of the Debtor.  Id. at ¶25.  The Debtor used Property Pals, LLC ("Property Pals"), another entity owned and operated by Mr. Khawaja and Mr. Breen, to manage the Properties.  Id. at ¶38.  Mr. Khawaja, through Property Pals, was primarily responsible for management of the Properties, including leasing, maintenance, repair, and tenant relations, while Mr. Breen was primarily responsible for overseeing the Debtor's and Asset Management LLC's corporate, legal

---

Adopt asserted for the first time that ALPS Group is a "non-entity" that only appeared in the Adversary because it was named as a defendant in the Complaint.  When the Court asked how a "non-entity" could appear and be represented, counsel replied that "if they don't exist then they shouldn't have been named in the litigation."  Hearing Recording at 4:46. No Defendant, however, has moved to dismiss the Complaint against ALPS Group on this basis, and as the Court advised at the Hearing, the issue was not properly before it, nor has it been formally raised since the Hearing.  As such, the Court rules on the James Paul Motion to Dismiss, adopted by ALPS Group, without any finding or ruling as to whether ALPS Group is or can be a properly-named defendant.

[7] This factual background is based on Plaintiff's well-pleaded factual allegations, construed in a light most favorable to Plaintiff, as required when considering a motion to dismiss.  *See, e.g., Crabtree v. Academy Life Ins. Co.,* 878 F.Supp. 727, 729 (E.D. Pa. 1995) (citing *Piecknick v. Commonwealth of Penn.,* 36 F.3d 1250, 1255 (3d Cir. 1994)).

and financial affairs.  Id. at ¶27.

The Debtor financed its acquisition of the Properties from Mr. Khawaja and Mr. Breen in part with a loan from CoreVest American Finance Lender LLC ("CoreVest"), which was later assigned to Wilmington Trust (referred to hereafter as the "Wilmington Trust Loan").  Id. at ¶29. The Wilmington Trust Loan was in the original principal amount of $1,120,700.00, made pursuant to a Commercial Loan Agreement (the "Loan Agreement").  Id. at ¶30.  In conjunction with the Loan Agreement, the Debtor executed a promissory note (the "Note") and two mortgages, one for the Philadelphia Properties (the "Philadelphia Mortgage") and one for the Delaware County Properties (the "Delaware County Mortgage" and together with the Philadelphia Mortgage, the "Mortgages").  Id. at ¶31.  Mr. Khawaja and Mr. Breen also executed personal guaranties in connection with the Wilmington Trust Loan (the "Personal Guarantees"). Id.

At the same time as the Loan Agreement, the Debtor executed a First Assignment of Management Agreement and Subordination of Management Fees (the "Management Rights Agreement").  Id. at ¶37.  Pursuant to that agreement, upon an event of Default, CoreVest (and subsequently Wilmington Trust) was entitled to exercise the rights of the Debtor under its property management agreement with Property Pals.  Id. at ¶39.

### B.      Mr. Khawaja's Bankruptcy and Wilmington Trust's Declaration of Default

Approximately one year after the Wilmington Trust Loan was made, Mr. Khawaja filed his own bankruptcy case, on August 30, 2019 (the "Khawaja Bankruptcy Case").  Id. at ¶40. Shortly thereafter, on September 3, 2019, Wilmington Trust agreed with the Debtor to replace Property Pals as manager of the Properties with BMG.  Id at ¶44.  The Debtor also entered into a

4

second Management Rights Agreement with Wilmington Trust at that time.  Id.  Mr. Khawaja's

bankruptcy filing rendered him ineligible to participate in the management of Asset Management

LLC, the sole managing member of the Debtor.  Id. at ¶41.  As such, following the filing of his

bankruptcy case and entry into the Second Management Rights Agreement, Mr. Khawaja no

longer managed the Debtor nor the Properties through Property Pals.  Id. at ¶45.

Midland Loan Services ("Midland"), Wilmington Trust's servicer for the Wilmington

Trust Loan, continued to send monthly invoices to the Debtor until February 2020 that did not

include default interest or late charges, which the Debtor paid as invoiced.  Id. at ¶¶47, 48.  On

January 9, 2020, however, Wilmington Trust issued a Notice of Default to the Debtor (the

"Default Notice"), citing the bankruptcy filing of Mr. Khawaja as a guarantor of the Wilmington

Trust Loan.  Id. at ¶¶49, 50.  Thereafter, Midland issued the Debtor an invoice in the amount of

$48,311.26 payable by March 9, 2020, stating that $35,986.48 was past due, including

$24,305.74 for "Past Due Default Interest".  Id. at ¶60.  Wilmington Trust subsequently invoiced

the Debtor for other fees and late charges, a prepayment premium, and legal fees.  Id. at ¶64.

The Debtor, under Mr. Breen's management, suspended payments on the Wilmington

Trust Loan in February 2020.  Id. at ¶66.

### C.      Management and Possession of the Properties After Notice of Default

On November 30, 2020, Wilmington Trust gave the Debtor notice (the "Rents

Assignment Notice") that it was exercising its rights under the second Management Rights

Agreement and the provision in the Mortgages governing assignment of rents, to take control of

the leases and rents attributable to the Properties.  Id. at ¶¶68, 69.  Subject to the Debtor's

oversight, BMG had been managing the Properties, including leasing, maintenance, repair, and

collecting all rents, since BMG replaced Property Pals in September 2019.  Id at ¶¶70, 71.  After

Wilmington Trust issued the Rents Assignment Notice, BMG did so subject to Wilmington

Trust's oversight.  Id. at ¶72.

Shortly thereafter, on December 9, 2020, Wilmington Trust filed Complaints in Mortgage

Foreclosure (the "Foreclosure Complaints") in Philadelphia and Delaware County to foreclose

on the Properties (the "Foreclosure Actions").  Id. at ¶78.  In addition to pursuing foreclosure,

Wilmington Trust also sought the appointment of Defendant James Paul of ALPS Group as

receiver for the Properties, including the rents.  Id. at ¶86.

On February 10, 2021, the Debtor filed its first bankruptcy case in this Court.[8]  Id. at ¶89.

Ultimately, that case was dismissed on January 25, 2022 on motion by the United States Trustee.

Id. at ¶90.  While the Debtor's first bankruptcy case was pending, however, BMG continued to

manage the Properties and collect the rents pursuant to the second Management Rights

Agreement and the Rents Assignment Notice.  Id. at ¶93.  Neither Wilmington Trust nor BMG

filed an accounting with this Court while the Debtor's first bankruptcy case was pending or after

it was dismissed.  Id.

After the Debtor's first bankruptcy case was dismissed, Wilmington Trust renewed its

request in the Foreclosure Actions for the appointment of James Paul as receiver for the

Properties.  Id. at ¶94.  On March 10, 2022, James Paul of ALPS Group (together, the

"Receiver") was appointed by the Philadelphia court as receiver of the two Philadelphia

Properties, and on March 18, 2022, was appointed by the Delaware County court as receiver of

the eleven Delaware County Properties (the "Receivership Orders").  Id. at ¶99.  Each of the

---

[8] Bankr. Case No. 21-10332.

Receivership Orders provided, *inter alia,* that the Receiver was authorized and directed to
immediately take and have exclusive control, possession, and custody of the Properties, with
such control to extend to (a) the entire Property, (b) all assets associated with or derived from the
Property, and (c) all income the Property has generated or generates thereafter. Id. at ¶99, Ex. M
and N. Wilmington Trust took no further substantive action thereafter to prosecute the
Foreclosure Actions prior to the Debtor filing its current bankruptcy case. Id. at ¶¶105-107.

### D.    Debtor's Second Bankruptcy Case and Sale of the Properties

Mr. Breen had filed his own personal bankruptcy case in October 2021 (the "Breen
Bankruptcy Case"). Id. at ¶109.[9] On June 7, 2022, Mr. Khawaja and Mr. Breen entered into a
settlement agreement (the "Settlement Agreement") resolving various disputes arising from their
relationship in forming, capitalizing, and managing the Debtor's affairs. Id. at ¶108. The
Settlement Agreement provided, *inter alia*, for the transfer of ownership and control of Asset
Management LLC to Mr. Khawaja, as well as all other offices held by Mr. Breen. Id. The
Settlement Agreement was submitted to this Court for approval in both the Khawaja Bankruptcy
Case and the Breen Bankruptcy Case, and such approval was granted on June 30, 2022. Id. at
¶110.

Mr. Khawaja then engaged in efforts on behalf of the Debtor to resolve the Wilmington
Trust Loan, but did not receive what he believed was a complete and definitive payoff statement
that could be used to explore a sale or refinancing of the Properties. Id. at ¶¶111, 114. Unable to
reach a resolution with Wilmington Trust, the Debtor filed the instant bankruptcy case on
November 21, 2022 (the "Petition Date") under subchapter V of chapter 11 of the Bankruptcy

---

[9] Bankr. Case No. 21-12968.

Code.  Id. at ¶123.

On January 2, 2023, the Debtor filed a motion seeking turnover of the Properties by the
Receiver pursuant to §543(b) of the Bankruptcy Code (the "Turnover Motion").  Id. at ¶128.[10]
The Receiver did not respond to the Turnover Motion, nor did it file any motion seeking to be
excused from the requirements of §543(b).  Id. at ¶129.  Wilmington Trust, however, did oppose
the Turnover Motion (the "Turnover Opposition").  Id. at ¶130.[11]  Wilmington Trust also filed a
motion to terminate the automatic stay to allow it to pursue state law remedies against the Debtor
(the "Stay Relief Motion").[12]

After a number of continuances, a status conference on the Turnover Motion, the Stay
Relief Motion, and confirmation of the Debtor's proposed Plan of Reorganization was scheduled
for May 31, 2023.  On May 20, 2023, however, the Debtor filed a motion seeking expedited
consideration of the Turnover Motion, alleging that it had come to learn that many of the
Properties were in a state of disrepair and/or vacant.[13]  The Court scheduled a hearing on the
Turnover Motion for June 12, 2023,[14] but was advised on that date that the parties had resolved
the motion.  On June 13, 2023, Wilmington Trust submitted, and the Court entered, an agreed
Order providing, *inter alia,* for the Receiver to "immediately commence turnover to Debtor of
control, possession, and custody of the [Properties]" and all assets related to the Properties by no
later than June 19, 2023 (the "Turnover Order").  Id. at ¶130.[15]  In the approximately seven

---

[10] Bankr. Docket No. 31.

[11] Bankr. Docket No. 43.

[12] Bankr. Docket No. 43.

[13] Bankr. Docket No. 94.

[14] The Stay Relief Motion and plan confirmation were scheduled to be heard on August 9, 2023.

[15] Bankr. Docket No. 109.

months between the Petition Date and the date of the Turnover Order, the Receiver continued to

control and manage the Properties, including the collection and use of rents.  Id. at ¶133.

After regaining management of and control over the Properties, on June 20, 2023, the

Debtor filed a motion to sell the Properties (the "Sale Motion") to a purchaser for $1,750,000.

Id. at ¶136.[16]  Wilmington Trust objection to the Sale Motion,[17] and on August 9, 11, and 16,

2023 the Court held a contested evidentiary sale hearing, after which it entered an order granting

the Sale Motion.  Id. at ¶¶137, 142.[18]  Settlement on the Properties' sale occurred on August 31,

2023, with net sale proceeds of $1,706,715.53.  Id. at ¶143.

### E.   Plaintiff's Initiation of the Adversary

On September 18, 2023, the Plaintiff initiated this Adversary against the Defendants.[19]

The Plaintiff's claims can broadly be described as complaints regarding (a) Wilmington Trust's

issuance of the Default Notice to the Debtor due to the Khawaja Bankruptcy Case, (b)

Wilmington Trust's assertion of default interest, fees and penalties after issuing the Default

Notice, and (c) the alleged degradation and mismanagement of the Properties during what the

Complaint defines as the "Custodial Period," *i.e.,* the period of time from November 30, 2020,

when Wilmington Trust issued the Rents Assignment Notice, and approximately June 13, 2023,

when the Court issued the Turnover Order directing the Receiver to commence turnover of

control, possession, and custody of the Properties to the Debtor.

With respect to the Default Notice and Wilmington Trust's resulting claim for default-

---

[16] Bankr. Docket No. 118.

[17] Bankr. Docket No. 126.

[18] Bankr. Docket No. 145.

[19] Bankr. Docket No. 154; Adv. Pro. Docket No. 1.

related charges, the Plaintiff concedes that the filing of the Khawaja Bankruptcy Case was an

event of default under §8.1(d) of the Loan Agreement, but asserts that Wilmington Trust waived

its remedies with respect to such default by failing to issue the Default Notice for over four

months, and instead entering into the second Management Rights Agreement with the Debtor

and invoicing and accepting monthly payments from the Debtor in the pre-default amount from

September 2019 through February 2020. Id. at ¶¶42, 43, 46-48.  The Plaintiff also asserts that the

filing of the Khawaja Bankruptcy Case was an immaterial, non-monetary default for which

Wilmington Trust not only waived its rights, but also committed breach of the various loan

documents and applicable law restricting the enforcement of non-monetary defaults, as well as

breach of Wilmington Trust's implied covenant of good faith and fair dealing applicable under

the laws of New York and Pennsylvania.  Id. at  ¶¶51, 52.  The Plaintiff asserts that Wilmington

Trust's breach is further evidenced by the post-Default Notice statements it issued to the Debtor,

adding improper and oppressive monetary demands as a condition of forbearance or repayment

of the Wilmington Trust Loan, thereby rendering the Debtor immediately insolvent on a cash-

flow basis, and then failing to provide an accurate and complete payoff statement to Mr.

Khawaja that did not include the improper amounts.  Id. at ¶¶60-65, 119-122.

    With respect to the alleged degradation and mismanagement of the Properties during the

Custodial Period, the Plaintiff alleges that Wilmington Trust was in effective possession,

custody, and control of the Properties, first through BMG as its agent and then through the

Receiver, and that it neither accounted for the application and use of rents received during that

time period nor appropriately maintained and managed the Properties, including the rents and

leases with respect thereto.  Id. at ¶¶73-77.  The Plaintiff alleges that when the Debtor recovered

possession and control of the Properties on or about June 13, 2023, (a) half of the Properties'

units were vacant, with three occupied by squatters; (b) almost $55,000 in rents were reported

past-due and uncollected by James Paul; (c) no rental licenses were in place; (d) almost $42,000

in delinquent real estate taxes and utilities were owed on the Properties; (e) deplorable and

unhealthy conditions existed at many of the Properties, and (f) only approximately $25,000 in net

rents remained to operate the Properties.  Id. at ¶134.  While the Properties had appraised for

$2,192,000 in September 2022, the Plaintiff asserts their condition had so deteriorated under the

management of the Defendants that by July 2023 they appraised for only $1,757,000, with over

$790,000 in repairs needed to restore them to rent-ready condition.  Id. at ¶¶138-139.

As noted *supra,* the Plaintiff has asserted five counts against some or all Defendants.

Count I seeks an accounting from all Defendants.  Id. at ¶¶154-165.  The Complaint alleges that

each Defendant owed fiduciary duties to the Debtor and/or its bankruptcy estate to manage,

protect and preserve the Properties and to diligently collect and apply the rents received

appropriately, and the Defendants are jointly and severally obligated to account for the

Properties' use, management, care and disposition.  Id. at ¶¶155, 156.  The Plaintiff therefore

seeks that the Defendants be ordered, jointly and severally, to provide an accounting of their

collective administration of the Properties during the Custodial Period, pursuant to "the equitable

jurisdiction of this Court, under Bankruptcy Code §105 and in accordance [with] the

requirements of Bankruptcy Code §543(b), Bankruptcy Rule 6002, and generally applicable law

governing fiduciary accounts."  Id. at ¶¶164-165.

Count II of the Complaint asserts a breach of contract claim against Wilmington Trust.

Id. at ¶¶166-176.  As discussed *supra,* the Plaintiff alleges that Wilmington Trust breached the

loan documents and applicable law by issuing the Default Notice and thereafter exercising

remedies, including pursuit of the Foreclosure Actions and appointment of the Receiver, that

violate applicable law restricting the enforcement of non-monetary defaults.  Id. at ¶¶168-173.

The Plaintiff asserts that Wilmington Trust's breach resulted in damages to the Debtor likely to

exceed $1,055,000.  Id. at ¶175.

Count III asserts a breach of fiduciary duty and waste claim against all Defendants.  Id. at

¶¶177-188.  The Plaintiff asserts that the Defendants breached their fiduciary duties to the Debtor

and/or the bankruptcy estate by their gross mismanagement and waste in the use, management,

care, and disposition of the Properties during the Custodial Period.  Id. at ¶183.  The Plaintiff

further asserts that Wilmington Trust should be held jointly liable for the entire loss caused

during the possession and alleged mismanagement of the other Defendants because it effectively

held possession, custody and control of the Properties for the entire Custodial Period through

BMG and then James Paul and ALPS Group.  Id. at ¶185.

Count IV asserts a claim against Wilmington Trust, James Paul and ALPS Group for

violation of §§543(b) and 362(a) of the Bankruptcy Code.  Id. at ¶¶189-204.  The Plaintiff

alleges that, by continuing to exercise possession and control over the Properties after the

Petition Date without authorization, accounting to this Court, or relief from stay, the Receiver

violated the afore-mentioned provisions of the Bankruptcy Code.  Id. at ¶190.  The Plaintiff

asserts that the obligation to turn over the Properties to the Debtor was self-effectuating, and not

only did the Receiver not seek to be excused from this requirement, but it continued to pay its

management fees from the rents collected from the Properties without authorization.  Id. at

¶¶193-195, 199.  The Plaintiff alleges various damages resulted from the Receiver's continued

possession, including the further degradation of the Properties, the deprivation of the income

from the Properties, the incurrence of penalties and interest resulting from delayed payment of

real estate taxes and utilities for the Properties, and the receipt of a lower sale price for the

Properties.  Id. at ¶203.

Count V asserts a claim against Wilmington Trust for equitable subordination pursuant to

§510(c) of the Bankruptcy Code.  Wilmington Trust filed a secured claim against the Debtor in

the amount of $2,084,794.88 (the "Wilmington Trust Claim").  Id. at ¶8.[20]  The Plaintiff alleges

that Wilmington Trust's actions constitute inequitable conduct that has caused injury to other

creditors or conferred unfair advantage on Wilmington Trust, warranting subordination of any

allowed portion of the Wilmington Trust Claim to all unsecured priority and non-priority claim,

and/or the transfer of the lien securing the Wilmington Trust Claim to the Debtor's estate.  Id. at

¶208.

## III.   DISCUSSION

### A.    Motion to Dismiss Standard

James Paul has moved to dismiss pursuant to Rule 12(b)(1), while Wilmington Trust has

moved to dismiss pursuant to Rule 12(b)(6).  The standard of review for a Rule 12(b)(1) facial

challenge to the court's subject matter jurisdiction is the same as the standard governing review

of a Rule 12(b)(6) motion.  *See, e.g., In re Marchese,* 2018 WL 3472823, at *3 (Bankr. E.D. Pa.

July 16, 2018) (citing cases); *see also In re Merritt,* 529 B.R. 845, 858 (Bankr. E.D. Pa. 2015)

(generally when a party challenges a court's subject matter jurisdiction before filing an answer to

---

[20] Proof of Claim No. 15-1.

the complaint, its challenge is viewed as a facial attack on jurisdiction) (citing *Constitution Party of Penn. v. Aichele,* 757 F.3d 347, 358-59 (3d Cir. 2014)).

Rule 12(b)(6) requires the Court to accept as true all well-pleaded factual allegations of the Complaint, construe disputed facts in a light most favorable to the Plaintiff, and determine whether, under any reasonable reading of the Complaint, the Plaintiff may be entitled to relief. *In re Reinford*, 2010 WL 4026806, at *1 (Bankr. E.D. Pa. Oct. 7, 2010) (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  Dismissal is appropriate only if, accepting as true all facts alleged in the Complaint, the Plaintiff has not pleaded enough facts to state a claim to relief that is plausible on its face.  *Id.*  (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)).

While the Complaint need not include detailed factual allegations, it does need to go beyond "a formulaic recitation of the elements of a cause of action … Factual allegations must be enough to raise a right to relief above the speculative level."  *In re Reading Broadcasting, Inc.*, 390 B.R. 532, 548 (Bankr. E.D. Pa. 2008) (quoting *Twombly*).  This Court's role "is limited to determining whether, based upon the allegations of the complaint, accepted as true with all reasonable inferences, the plaintiff is entitled to offer evidence in support of the claims, and not whether the plaintiff will ultimately prevail upon the merits.  Resolution of that issue requires that the complaint contain sufficient averments to provide fair notice to the defendant of the claims asserted, and that the factual allegations suggest the required elements of the individual

claims.  The standard does not require that a plaintiff plead every fact upon which his claim is based." *Id.* (internal citations omitted).

In determining motions to dismiss under Rule 12(b)(6), the Third Circuit has articulated a two-part test to be employed.  First, the factual and legal elements of a claim should be separated, accepting all well-pleaded facts as true but disregarding any legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  Second, the Court must then determine whether the facts alleged in the Complaint are sufficient to show that the Plaintiff has a plausible claim for relief.  *Id.* at 212.  The Complaint must do more than allege the Plaintiff's entitlement to relief; it must show such an entitlement with its pleaded facts.  *Id.*  Where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the Complaint has not shown the Plaintiff is entitled to relief.  *Id.*  The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### B.    Wilmington Trust's Motion to Dismiss

#### 1.    Count I for Accounting[21]

##### a.    The Parties' Arguments

Wilmington Trust asserts that even if all allegations in the Complaint are taken as true, the claim against Wilmington Trust in Count I for an accounting should be dismissed because there is no private right of action against a non-custodian secured creditor for an accounting under §543(b) of the Bankruptcy Code or Bankruptcy Rule 6002.  Wilmington Trust argues that any such obligation on a custodian does not apply to it, because it was not a custodian of the

---

[21] Although Wilmington Trust addresses this count last in its Motion to Dismiss, the Court finds it more logical to discuss it first, as it appears in the Complaint and as the Plaintiff does in its Opposition.

Property.  Wilmington Trust further argues that the Court cannot require an accounting pursuant to §105 of the Bankruptcy Code because that provision does not empower bankruptcy courts to award equitable relief independent of rights arising in or under the Bankruptcy Code.

The Plaintiff responds by asserting that §543(b) expressly requires an accounting from a custodian and authorizes a surcharge based on the results, which is plainly applicable to the Receiver.  The Plaintiff argues, however, that its primary claim under Count I is not a cause of action arising under §105 of the Bankruptcy Code, but rather it is for an equitable accounting, recognized under the common law of Pennsylvania and cognizable within the Court's equitable jurisdiction.  The Plaintiff argues that the Complaint alleges sufficient facts to support a claim against Wilmington Trust and all other Defendants for an equitable accounting.

Wilmington Trust replies that the Plaintiff's revised claim, under Pennsylvania common law rather §543(b) and Bankruptcy Rule 6002 as stated in the Complaint, fails as a standalone claim and cannot replace seeking information through discovery.

### b.        The Court's Analysis

An equitable accounting is available only when there is no adequate remedy at law.  *See, e.g., Benefit Control Methods v. Health Care Servs., Inc.,* 1998 WL 22080, at *2 (E.D.Pa. Jan. 16, 1998) (citing *Taylor v. Wachtler,* 825 F.Supp. 95, 104 (E.D.Pa. 1993) and *Buczek v. First Nat. Bank of Mifflintown,* 366 Pa. Super. 551, 556, 531 A.2d 1122 (1987)).  Where the information sought by the accounting is obtainable through discovery under the Federal Rules of Civil Procedure, the accounting claim fails.  *Id.*  Here, the only count of the Complaint for which Wilmington Trust has not sought dismissal is Count III, which asserts breach of fiduciary duty and waste claims against all Defendants.  The Court believes it is at least arguable that the

16

information sought by the accounting relates to the damages the Debtor suffered as a result of the

Defendants' alleged breach of fiduciary duty, and therefore that information would be readily

obtainable through the federal discovery rules.  *See id.* (dismissing accounting claim because it

sought the same information on damages underlying the plaintiff's breach of contract claim, and

therefore the plaintiff had an adequate remedy at law).

However, the Complaint states that it seeks an accounting pursuant to, *inter alia,*

"generally applicable law governing fiduciary accounts."  Therefore Count I as stated goes

beyond a claim for an equitable accounting.  A claim for an accounting at law also exists and is

proper where:

> (1)　There was a valid contract, express or implied, between the parties
> whereby the defendant:
>
>> a.　Received money as agent, trustee or in any capacity
>> whereby the relationship created by the contract imposed a
>> legal obligation upon the defendant to account to the
>> plaintiff for the monies received by the defendant; or
>>
>> b.　If the relationship created by the contract between the
>> plaintiff and the defendant created a legal duty upon the
>> defendant to account and the defendant failed to account
>> and the plaintiff is unable, by reason of the defendant's
>> failure to account, to state the exact amount due him, and
>
> (2)　The defendant breached or was in dereliction of his duty under the
> contract.

*Bristol Township v. Independence Blue Cross,* 2001 WL 1231708 (E.D. Pa. Oct. 11, 2001)

(citing *Haft v. U.S. Steel Corp.,* 346 Pa.Super. 404, 499 A.2d 676, 677-78 (Pa. Super. Ct. Oct. 18,

1985) and *Berger & Montague, P.C. v. Scott & Scott, LLC,* 153 F.Supp.2d 750, 754 (E.D.Pa.

2001)).

Under this test, the Court finds that the Complaint adequately states a claim for an

accounting against Wilmington Trust.  The Complaint adequately alleges the existence of a valid

contract between the Debtor and Wilmington Trust, *i.e.,* the Loan Agreement and the other loan

documents.  It further alleges that Wilmington Trust enforced certain rights under those contracts

following issuance of the Default Notice, including entry into the first and second Management

Rights Agreements, issuance of the Rents Assignment Notice, institution of the Foreclosure

Actions, and seeking the appointment of the Receiver.  The Complaint asserts in Count III that,

in exercising these remedies, Wilmington Trust (and the other Defendants) had a duty to protect

and maintain the Properties, collect and correctly apply rents received therefrom, and account to

the Debtor for the rent received, the costs incurred, and how the rents were applied.  The

Complaint further asserts that in allegedly failing to abide by these duties, Wilmington Trust and

the other Defendants committed mismanagement and waste, resulting in a severe degradation of

the Properties' condition and a depreciation in their value.

Wilmington Trust has not sought dismissal of the fiduciary duty and waste claims in

Count III, and these allegations plead the facts necessary for an accounting at law claim against

Wilmington Trust.  This claim's plausibility, however, is limited to the period of time from entry

into the second Management Rights Agreement until the Pennsylvania courts appointed the

Receiver.  The Complaint adequately alleges that during this portion of the Custodial Period,

BMG managed the Properties for the benefit of and at the direction of Wilmington Trust, and

that the condition and value of the Properties degraded during that time. However, the Complaint

does not state a plausible accounting claim against Wilmington Trust for the portion of the

Custodial Period that post-dates the appointment of the Receiver.  As of the appointment, the

Properties came under the Receiver's possession and control.  *Levin v. McClaskey,* 97 A. 682,

252 Pa. 520 (Pa. 1916) (stating that the appointing court took the receivership property into its hands through the receiver); *see also In re Greenleaf Apartments, Ltd.*, 158 B.R. 456 (Bankr. S.D. Ohio 1992).  Neither the Receiver nor the Properties were subject to Wilmington Trust's possession or control as a matter of law, and once the Receiver was appointed Wilmington Trust had no ability or responsibility to maintain or protect the Properties.  There is therefore no plausible claim for an accounting against Wilmington Trust in equity or at law for the Custodial Period post-dating the Receiver's appointment.

## 2.    Count II for Breach of Contract

### a.    The Parties' Arguments

Wilmington Trust argues that Count II fails to state a breach of contract claim against it because the actions the Plaintiff asserts constituted a breach of contract were valid and permissible under the loan documents following the Debtor's default.  Wilmington Trust notes that the Complaint at paragraph 42 admits the Khawaja Bankruptcy Case constituted an event of default.  Given that, Wilmington Trust's issuance of the Default Notice and exercise of remedies, including issuing the Rents Assignment Notice, instituting the Foreclosure Actions, requesting the appointment of a receiver for the Properties, filing a proof of claim in the present case, objecting to the Turnover Motion and the Sale Motion, and asserting ownership of the rents from the Properties, were all lawful remedies which Wilmington Trust was entitled to pursue under the loan documents and, in certain of these instances, lawful and valid rights under the Bankruptcy Code.

Wilmington Trust further argues that the exercise of these remedies cannot be a breach of the duty of good faith as a matter of law because Pennsylvania has never extended the duty of

good faith to the borrower-lender relationship, and because even if that duty does exist, it does not compel a lender to surrender rights granted to it by statute or by the terms of a loan agreement.  Finally, Wilmington Trust argues that the Complaint's allegations that the remedies Wilmington Trust pursued were taken in bad faith also fails because bad faith sounds in tort, which the Pennsylvania courts have never permitted based entirely on an alleged breach of contract.[22]

The Plaintiff responds that New York law governs, not Pennsylvania law as Wilmington Trust asserts, and New York considers immaterial, non-monetary defaults to be unenforceable, regardless of whether they are technical defaults under the terms of a loan document, and imposes a duty of good faith and fair dealing that Wilmington Trust breached after issuing the Default Notice.  Moreover, the Plaintiff argues, Wilmington Trust waived its right to enforce any default and was equitably estopped from claiming default after it accepted five months of payments from the Debtor in the non-default amount following the filing of the Khawaja Bankruptcy Case.  As such, the Plaintiff argues, the Complaint adequately pleads a breach of contract claim against Wilmington Trust.

Wilmington Trust replies by highlighting the Plaintiff's admission that the Khawaja Bankruptcy Case was an event of default, and that Wilmington Trust's actions to protect and enforce its security interest in the Properties following that default, which the Plaintiff argues constituted a breach, are governed by and construed under the law of Pennsylvania, where the Properties are located.  With respect to the Plaintiff's argument that Wilmington Trust waived

---

[22] Wilmington Trust also argues that the Plaintiff's allegations fail to meet the stringent pleading requirements for fraud or mistake under Federal Rule of Civil Procedure 9(b).  The Court is not clear to what allegations Wilmington Trust is referring, as the Complaint does not include any fraud allegations.  In its response, the Debtor confirmed that its claim does not sound in fraud.

the right to declare a default had occurred, Wilmington Trust argues that §9.22 of the Loan

Agreement expressly provides that any delay in exercising its rights does not constitute a waiver,

and in any event, neither Mr. Khawaja nor the Debtor provided notice to Wilmington Trust of his

bankruptcy case and Wilmington Trust did not become aware of it until December 2019, shortly

after which it issued the Default Notice.  Wilmington Trust further argues that a lender does not

breach the duty of good faith inherent in all contracts by adhering to its agreement with a

borrower and enforcing its legal and contractual rights.

### b.    The Court's Analysis

#### i.    New York Law Governs the Breach of Contract Claim

As an initial matter, the Court must determine whether New York law or Pennsylvania

law governs the Complaint's breach of contract claim.

Wilmington Trust argues the law of Pennsylvania governs because the actions

Wilmington Trust took that are alleged to have constituted breach were in furtherance of the

enforcement of its liens and security interests, and §11.01 of the mortgages for the Properties

(the "Mortgages") provides that the laws of the state in which the Properties are located govern

"matters relating to the creation, perfection and enforcement of liens and security interests."  See

Complaint at Exs. D and E, §11.01 (respectively).[23]  The Plaintiff responds that New York law

governs, as set forth in §9.20(a) of the Loan Agreement, providing that "This agreement shall be

governed by, and construed in accordance with the laws of the State of New York pursuant to

Section 5-1401 of the New York General Obligations Law."  See Complaint at Ex. B, §9.20.

The Plaintiff argues that New York law limits the enforcement of a lender's right to acceleration

---

[23] That section of the Mortgages, however, also provides that other than those matters, New York law governs all
other matters related to the Mortgages and other loan documents.  Id.

following non-monetary defaults, and New York courts look to three factors in determining

whether a non-monetary default is enforceable: (a) whether the lender suffered actual damages as

a result of the default, (b) whether the default impaired the lender's security, and (c) whether the

default made future repayment of principal and interest less likely.  The Khawaja Bankruptcy

Case, according to the Plaintiff, was an immaterial, non-monetary default that did not properly

trigger Wilmington Trust's right to accelerate the Wilmington Trust Loan debt under New

York's three-factor inquiry.

Based on §11.01 of the Mortgages, the answer to which state's law governs the

Complaint's breach of contract claim is dependent on whether Wilmington Trust's alleged

actions and inactions on which the claim is based constitute matters relating to "the creation,

perfection and enforcement" of Wilmington Trust's liens and security interests on the Properties.

If so, Pennsylvania law governs; if not, New York law governs.  Plainly, the Complaint's

allegations do not relate to the creation or perfection of Wilmington Trust's liens on or security

interests in the Properties.  Rather, they relate solely to what Wilmington Trust did and did not

do following the filing of the Khawaja Bankruptcy Case.  There can therefore only be a basis for

finding that Pennsylvania law governs if the Complaint's allegations forming the breach of

contract claim relate to the enforcement of Wilmington Trust's liens and security interests.

Reviewing the Complaint's allegations, the Court concludes the fundamental premise of

the Complaint's breach of contract claim is that Wilmington Trust improperly and in bad faith

treated the Khawaja Bankruptcy Case as a default under the Loan Agreement, which then

resulted in a series of enforcement measures taken that themselves were a breach of the Loan

Agreement.  See Complaint at ¶¶168 to 173.  The enforcement measures are alleged to have

22

constituted a breach, however, only because the initial declaration of default was improper: "The exercise of such remedies could only be proper if authorized by a valid and enforceable Event of Default under [the] Loan Agreement.  As set forth above, there was no valid and enforceable Event of Default to support the exercise of such remedies."  Id. at ¶¶172-173.  While paragraph 167 of the Complaint does state that Count II seeks declaratory relief and damages "relating to [Wilmington Trust's] improper declaration of default, enforcement and exercise of remedies under the Loan Documents," the allegations that follow make clear that Wilmington Trust's declaration of default was the alleged triggering breach that rendered all enforcement actions taken thereafter breaches as well.  This is evidenced by the stated relief sought for Wilmington Trust's alleged breach of contract, which nowhere asserts damages or relief with respect to enforcement measures, but instead "requests this Court declare the alleged Event of Default based on the Khawaja Bankruptcy filing, and all fees and charges added thereafter to the principal and regular interest on the Loan, to the extent based on the existence of a default, invalid, null and void[.]".  Id. at ¶176.  Therefore the breach of contract claim does not stem from Wilmington Trust's enforcement measures, it stems from the declaration of default to begin with.

Having concluded that the Complaint's breach of contract claim does not constitute an action relating to Wilmington Trust's enforcement of its liens on and security interests in the Properties, the Court has no trouble concluding that New York law applies to the claim. Wilmington Trust's declaration of default due to the Khawaja Bankruptcy Case was based on §8.1(d) of the Loan Agreement, which deemed an "Event of Bankruptcy … with respect to any Restricted Party" to be an event of default.  The Court therefore finds that, pursuant to §9.20 of the Loan Agreement, New York law governs the breach of contract claim.

23

ii.     **Count II Fails to State a Claim Under New York Law
for Breach of Contract or Breach of the Implied
Covenant of Good Faith and Fair Dealing**

The Court concludes that the Complaint fails to state a claim against Wilmington Trust

for breach of contract or breach of the implied covenant of good faith and fair dealing.

The Complaint admits that the filing of the Khawaja Bankruptcy Case constituted an

Event of Default under §8.1(d) of the Loan Agreement.  Complaint at ¶42.  Under §8.2(a) of that

agreement, upon such a default "the Indebtedness shall immediately become due and payable

without the giving of any notice or other action by Lender," and "Lender may enforce or avail

itself of any or all rights or remedies provided in the Loan Documents against Borrower and the

Collateral (including all rights or remedies available at law or in equity)."  Loan Agreement at

§8.2.  As such, by the express terms of the Loan Agreement, the filing of the Khawaja

Bankruptcy Case constituted a default, triggering the acceleration of the Debtor's debt under the

Wilmington Trust Loan and Wilmington Trust's enforcement rights and remedies, whatever

those rights were.  Wilmington Trust was not in breach of the Loan Agreement by issuing the

Default Notice, and in fact, §8.2 of the Loan Agreement provides that the debt was accelerated

even absent any such notice.  Moreover, the Complaint does not state a claim that Wilmington

Trust waived the default by accepting payments in the non-default amount for several months

thereafter or failing to issue the Default Notice prior to January 2019.  Section 9.22 of the Loan

Agreement expressly provides that Wilmington Trust's delay in exercising its rights thereunder

does not operate as a waiver of such rights.

Nor does the Complaint assert a claim against Wilmington Trust for breach of the duty of

good faith and fair dealing.  While the duty of good faith and fair dealing is implicit in every

contract under New York law, "it cannot be construed so broadly as effectively to nullify other

express terms of a contract, or to create an independent contractual right." *See, e.g., Fesseha v.*

*TD Waterhouse Investor Services, Inc.*, 761 N.Y.S.2d 22, 23 (N.Y. App. Div. 2003) (affirming

trial court's dismissal of complaint asserting the defendant breached the covenant of good faith

and fair dealing in liquidating securities where the parties' agreement expressly gave the

defendant that right); *see also Staffenberg v. Fairfield Pagma Assocs., L.P.*, 944 N.Y.S.2d 568,

569 (N.Y. App. Div. 2012) ("The duty of good faith and fair dealing, however, is not without

limits, and no obligation can be implied that would be inconsistent with other terms of the

contractual relationship.") (internal quotations omitted).  New York courts have applied this

limitation to dismiss claims of breach of the implied covenant of good faith against lenders for

either taking action expressly authorized under a loan agreement or failing to take action that was

not required under a loan agreement and in contravention of its express terms.  *See, e.g., 87 Mezz*

*Member LLC v. German Am. Capital Corp.*, 81 N.Y.S.3d 1, 2 (N.Y. App. Div. 2018) (affirming

dismissal of complaint against lender asserting that foreclosure breached the good faith covenant,

and finding that an event of default occurred within the unambiguous language of the parties'

agreement as a matter of law and no provision required the lender to permit refinancing or

negotiate with the borrower, such that good faith could not be used to nullify the express

contractual terms); *Bayerische Landesbank v. 45 John Street LLC*, 960 N.Y.S.2d 64, 66 (N.Y.

App. Div. 2013) (affirming dismissal of borrower's claims for breach of contract and breach of

implied covenant of good faith against lender for failing to increase loan amount after the

borrower's defaults, since issuing an upsize loan would have been contrary to the express terms

of the loan agreement).

25

Here, the Complaint alleges that Wilmington Trust breached the implied duty of good faith by declaring default based on the Khawaja Bankruptcy Case, which the Debtor asserts was an immaterial, non-monetary default, and then seeking payment of default amounts.  As discussed *supra*, however, the Khawaja Bankruptcy Case was an express event of default, and the Loan Agreement provided for acceleration of the debt under the Wilmington Trust Loan and authorized Wilmington Trust to exercise whatever enforcement rights it had under the loan documents.  The above-cited New York decisions hold that a lender does not violate the implied covenant of good faith and fair dealing by adhering to the terms and conditions of a loan agreement to enforce its rights upon a debtor's default.

The Plaintiff argues that New York law limits enforcement of contractual rights based on non-monetary defaults, but the Court has found no decisions holding that enforcement of contractual remedies upon a non-monetary default breaches the implied covenant of good faith. Moreover, while the Plaintiff is correct in stating that New York law recognizes equitable exceptions to a lender's right to enforce acceleration upon a non-monetary default, *see, e.g., In re 53 Stanhope LLC*, 625 B.R. 573, 584 (Bankr. S.D.N.Y. 2021) (collecting cases), the three-factor test New York courts use does not help the Plaintiff.  As noted *supra,* those factors are (1) has the lender suffered actual damages as a result of the default, (2) has the default impaired the lender's security, i.e., the collateral securing the debt, and (3) does the default make the future payment of principal and interest less likely.  *Id.*  Here, part of Wilmington Trust's security was the personal guarantee of Mr. Khawaja, and therefore his bankruptcy filing impaired that security.  It also made repayment of principal and interest on the Wilmington Trust Loan less likely because it resulted in Wilmington Trust being able to look to one less source of repayment

in the event the Debtor committed a monetary default.  Therefore, while the Khawaja

Bankruptcy Filing was a nonmonetary default, the Court does not agree with the Plaintiff that it

was insignificant or technical.  *See Fifty States Mgmt. Corp. v. Pioneer Auto Park, Inc.*, 46

N.Y.2d 573, 577 (1979) (recognizing that equity will often intervene to prevent a substantial

forfeiture occasioned by a trivial or technical breach, but also noting that absent fraud,

exploitative overreaching, or unconscionable conduct, in the vast majority of instances

acceleration clauses for default by an obligor have been enforced at law in accordance with their

terms).

 This conclusion is supported by reference to the Loan Agreement itself.  Section 6.10

identifies an "Event of Bankruptcy" by a "Sponsor" (i.e., Mr. Khawaja or Mr. Breen) as a

"Material Event" for which the Debtor was required to give Wilmington Trust Notice.  Loan

Agreement, at §6.10.  That section goes on to require notice of "any other circumstance or event

*that could reasonably be expected to result in a Material Adverse Effect*."  Id. (emphasis added).

The Loan Agreement's enumerated Material Events are therefore events reasonably expected to

have a Material Adverse Effect, which is defined to include "a material adverse effect on … (c)

the ability of a Restricted Party to satisfy its Obligations under the Loan Documents when due."

Id. at §1.1.  Mr. Khawaja is a Restricted Party, and his Sponsor Guaranty is among the

enumerated Loan Documents.  Id.  Putting these Loan Agreement provisions together, the Debtor

agreed that a bankruptcy filing by Mr. Khawaja was among the events that required notice to

Wilmington Trust because it could reasonably be expected to have an adverse effect on, among

other things, the ability of Mr. Khawaja to satisfy his obligations under the Sponsor Guaranty.

Having so agreed, the Court rejects the Debtor's argument that the filing of the Khawaja

Bankruptcy Case was an immaterial nonmonetary breach.  The Parties' agreement says otherwise, and therefore the Court finds that as a matter of applicable New York law, Wilmington Trust was not in breach of the Loan Agreement by issuing the Default Notice and thereafter taking enforcement actions it was otherwise permitted to take under the loan documents.

The Complaint does not state a claim against Wilmington Trust for breach of contract of the duty of good faith and fair dealing, and Count III will be dismissed.

### 3.    Count IV for Violation of §§543(b) and 362(a)

#### a.    The Parties' Arguments

Wilmington Trust asserts that Count IV fails to state a claim against it under §§543(b) and 362(a) of the Bankruptcy Code for a number of reasons.  First, it argues that the Plaintiff seeks to hold Wilmington Trust vicariously liable for the Receiver's alleged failure to turn over the Properties, but there is no private right of action under §543(b) against a custodian, let alone Wilmington Trust as a non-custodian of the Properties.  Wilmington Trust asserts it was not a receiver or custodian of the Properties, regardless of its initial nomination of the Receiver or its secured interest in the Properties; rather, the Receiver was court-appointed and was not Wilmington Trust's agent or otherwise subject to its control or influence.  Wilmington Trust also argues that the Complaint fails to plead factual support for its assertion that the Receiver acted at the direction or control of Wilmington Trust, such that Wilmington Trust could be held liable for any asserted violation of §543(b) by James Paul.

Wilmington Trust also disputes the Plaintiff's assertion that it can be held to have violated §§543(b) and 362(a) by its actions in seeking (i) that the Receiver be excused from

28

turning the Properties over pursuant to §543(d), and (ii) stay relief to pursue the Foreclosure

Actions.  Wilmington Trust argues that creditors may seek that a custodian be excused from

§543(b)'s requirements, and bankruptcy courts evaluate such requests in light of what is in the

interests of creditors.  Here, Wilmington Trust argues, it is essentially the only creditor and was

within its rights under the Bankruptcy Code to seek stay relief, such that there is no support for a

claim against it for doing so.

The Plaintiff argues that Count IV pleads a claim for damages under §362(k) of the

Bankruptcy Code against Wilmington Trust, as well as the Receiver, because they failed to turn

over the Properties or seek to be excused from doing so, and failed to account for their

possession of and control over the Properties as required by §543(b).  The Plaintiff admits that

the Complaint unintentionally conflates violation of §543(b) with violation of §362(a) and

asserted damages under §362(k).  Based on this clarification, the Plaintiff argues that

Wilmington Trust's assertion that no private right of action exists under §543(b) is irrelevant.

Furthermore, the Plaintiff argues, the Complaint alleges sufficient facts supporting its claims that

Wilmington Trust acted in concert with the Receiver as its agent to violate the automatic stay,

including by contesting the Turnover Motion.  Finally, the Plaintiff argues that Wilmington

Trust's reliance on *Fulton* to argue that mere retention of estate property is not a stay violation is

misguided because the Defendants' control over, possession of and management of the

Properties, resulting in their severe degradation and depreciation, was not mere retention.

Wilmington Trust replies that the Plaintiff cites no case finding a lender or creditor liable

for a stay violation based on allegations that its opposition to a debtor's turnover request or

request for relief from turnover under §543(d).

**b.      The Court's Analysis**

In essence, Count IV of the Complaint alleges that Wilmington Trust is liable for the

Receiver's post-petition failure to turn over the Properties until entry of the Turnover Order

because the Receiver served at Wilmington Trust's direction as its agent.   The Court must

conduct a two-stage inquiry: first, as a matter of law can Wilmington Trust be held liable for the

Receiver's alleged violation of the turnover and automatic stay provisions of the Bankruptcy

Code, either directly or under an agency or collusion theory,[24] and only if so, does the Complaint

adequately plead facts, when viewed in a light most favorable to the Plaintiff, that the Receiver

was the agent of or colluded with Wilmington Trust.

Turning first to whether Wilmington Trust can be held liable for violation by the

Receiver of §543(b)'s turnover requirements, the plain language of the statute makes it

applicable only to "custodians."   *See* 11 U.S.C. §543(b).   Custodian is defined at §101(11) of the

Bankruptcy Code to include a "receiver or trustee of any property of the debtor, appointed in a

case or proceeding not under this title."   11 U.S.C. §101(11)(A).[25]   Here, the Receiver was

appointed by the Pennsylvania courts, not Wilmington Trust.   Section 543(b)'s requirements

therefore do not apply to Wilmington Trust.   *Cf. Seitz v. 6130 West, LLC (In re Joey's*

*Steakhouse, LLC)*, 474 B.R. 167, 189 (Bankr. E.D.Pa. 2012) (finding that the plaintiff trustee

could not state a claim for an accounting against the defendants under §543(b) because the

---

[24] The Court notes here that the Complaint's allegations with respect to Wilmington Trust's effective possession and control of the Properties are not limited to the post-petition period, but rather includes the pre-petition portion of the Custodial Period during which BMG served as property manager at Wilmington Trust's direction.   Count IV, however, can and does only related to the post-petition period.

[25] The definition also includes a "(B) assignee under a general assignment for the benefit of the debtor's creditors; or (C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien under such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors."

defendants were neither receiver, assignee, nor trustee, and therefore did not fall under the

definition of custodian set forth in the Bankruptcy Code); *see also In re TTC III Inc.*, 617 B.R.

894, 902 (Bankr. C.D.Cal. 2020) (defendants were not required to turn over funds pursuant to

§543(b) because they were not serving as a receiver, trustee, or assignee for the benefit of

creditors, and therefore did not fall within the statutory definition of custodian); *In re Camdenton*

*United Super, Inc.*, 140 B.R. 523, 525 (Bankr. W.D.Mo. 1992) (the statutory definition of

custodian requires that, to be a custodian, an entity must be engaged in the general administration

of the debtor's assets for the benefit of creditors).   Moreover, Wilmington Trust rightly points

out that a non-custodian cannot be compelled to turn over the debtor's property pursuant to

§543(b). *TTC III*, 617 B.R. at 902 ("To be required to turn over assets under §543(b)(1), 'an

entity must be engaged in the general administration of the debtor's assets for the benefit of

creditors.'") (*quoting Camdenton*).   As such, the Complaint fails to state a claim against

Wilmington Trust for failing to comply with §543(b)'s turnover requirement.[26]

The next inquiry is whether Wilmington Trust can be held liable for the Receiver's

alleged violation of §543(b) and §362(a)'s automatic stay based on an agency relationship.   The

Plaintiff argues that the Receiver's failure to turn over the Properties not only violated §543(b),

but also was a stay violation under §362(a) that came at the direction of and in collusion with

Wilmington Trust, for which the Receiver served as an agent.   Under Pennsylvania law,

however, a receiver is considered an officer and agent of the appointing court. *See, e.g., Gior*

*G.P., Inc. v. Waterfront Square Reef, LLC*, 202 A.3d 845, 856 (Pa. Comm. Ct. 2019) (*citing*

---

[26] Because the Court finds that Wilmington Trust was not a custodian subject to §543(b) and therefore is not subject
to its requirements, the Court declines to address Wilmington Trust's argument that no private right of action exists
under the statute, because even if one does, one does not lie against Wilmington Trust here.

*Commonwealth ex rel. Lewsiton Trust Co. v. Nestler*, 312 Pa. 484, 167 A. 354, 355 (Pa. 1933), which stated "A receiver is an executive officer of the court which appoints him, and his acts with regard to the property in his custody, when authorized, are the acts of the court in which hands, in contemplation of law, the property actually is."); *see also* 65 Am. Jur. 2d <u>Receivers</u> §1 (2024) ("A receiver, appointed by the court, in the discretion of the court, is an agent, representative, arm, fiduciary, or officer of the appointing court … A receiver is under the direction, control, supervision, and jurisdiction of the appointing court, as a medium through which the court acts.") (internal citations omitted).

Given that the Receiver served as agent and officer of the appointing Pennsylvania courts, the question is whether they nonetheless could be an agent of Wilmington Trust. The Court concludes that they could not. *See id.* ("A receiver is not an agent of any particular party to the action nor a party to a lawsuit, but represents the court and all persons interested in the property, as an unbiased, impartial, neutral, disinterested, or indifferent person between the parties to a cause.") (internal citations omitted).

Although decided under Ohio law, the Court finds instructive the case of *In re Greenleaf Apartments, Ltd.*, 158 B.R. 456 (Bankr. S.D. Ohio 1993), which parallels the facts here. There the debtor plaintiff, which had mortgaged its apartment project to the defendant lender, defaulted on its loan obligations. The defendant lender instituted foreclosure proceedings, and in connection therewith sought the appointment of a receiver to manage the project. The Ohio state court appointed the defendant receiver, who served for nearly two years. After the debtor plaintiff filed for bankruptcy, it filed an adversary action against, among others, the lender and receiver, asserting deterioration and increased vacancy at the apartment project. With respect to

the lender, the debtor plaintiff asserted that it negligently failed to take action to prevent

deterioration of the property, negligently recommended the receiver, negligently supervised his

performance, and failed to notify the debtor that the property was deteriorating in value under the

receiver's management.  The lender moved to dismiss the claims against it pursuant to Federal

Rule 12(b)(6).

The *Greenleaf Apartments* court started with the baseline principle that a court-appointed

receiver is subject only to the court's direction and control, and concluded that the debtor

plaintiff's allegation that the lender maintained control over the apartment project was incorrect

as a matter of law.  *Id.* at 458.  The court also found that because the lender had no duty to

protect collateral in the receiver's possession, the debtor's claims that the lender negligently

failed to safeguard the collateral or notify the debtor of its deterioration failed.  *Id.*  On this point,

the court stated: "Once a receiver is appointed by the court, the property passes into the

jurisdiction of the court, and the mortgagee is precluded from obtaining possession . . . Where

the mortgagee does not have possession . . . and possession is in the hands of a receiver, as an

agent of the court, the mortgagee has no duty to protect the property or to notify the plaintiffs of

any deterioration in value of the property."  *Id.* at 458-59.  Finally, the court rejected the debtor

plaintiff's claim that the receiver's negligence could be imputed to the lender under an agency

theory, finding that as a matter of law, the receiver could not be the agent of the lender: "For [the

receiver] to be considered an agent of [the lender, the lender] would have had to have had the

control over him required for an agency relationship.  However, a receiver is a court appointed

officer who is controlled exclusively by the court.  Because a receiver is an officer of the court,

he is not to be regarded as an agent or representative of either party to an action." *Id.* at 459.[27]

Although *Greenleaf Apartments* was decided under Ohio receivership law, Pennsylvania also holds that court-appointed receivers are an arm of the court, not agents of creditors or other third parties.  *See, e.g., Gior G.P.*, 202 A.3d at 856 (cited *supra*); *Levin v. McClaskey*, 97 A. 682, 252 Pa. 520 (Pa. 1916) (stating that the court took a company's property "into its hands through the agency of a receiver"); *Roma E. Provincia Build. & Loan Ass'n v. Penza*, 175 A. 430, 115 Pa. Super. 201 (Pa. Super. 1934) (referring to receiver as an agent of the court); *Wood v. Wood*, 167 A. 600, 312 Pa. 374 (Pa. 1933) (a firm's court-appointed liquidating receivers were "the appointees and agents of the court, not of the parties").  The Court therefore finds *Greenleaf Apartments* highly persuasive in resolution of the Plaintiff's agency theory underpinning its stay violation claim against Wilmington Trust.  The Receiver was the agent of the appointing Pennsylvania courts, and therefore as a matter of law could not take direction from or be under the control of Wilmington Trust as its agent.  Moreover, possession of the Properties remained in the hands of the Receiver as an agent of the Pennsylvania courts, and upon their appointment Wilmington Trust had no duty to protect the Properties.

Because the Court finds that, as a matter of law, the Complaint cannot state a claim against Wilmington Trust for violation of §543(b) or for James Paul and ALPS Group's alleged violation of §543(b) and §362(a) based on an agency theory, Count VI will be dismissed pursuant to Federal Rule 12(b)(6).  As such, the Court need not address whether the Complaint

---

[27] The *Greenleaf Apartments* court also found irrelevant the fact that the lender suggested the receiver, noting that a receiver that derives authority from the act of the appointing court, not from the parties at whose suggestion or by whose consent the receiver is appointed.  *Id.*

pleads sufficient facts to state a plausible claim.[28]

### 4.    Count V for Equitable Subordination

### a.    The Parties' Arguments

Wilmington Trust argues that Count V fails to state a claim for equitable subordination of the Wilmington Trust Claim under §510(c) of the Bankruptcy Code because it incorporates the entirety of the Complaint by reference and asserts in summary fashion that Wilmington Trust's actions constitute inequitable conduct that has caused injury to other creditors or conferred unfair advantage to Wilmington Trust.  Wilmington Trust argues that the Complaint does not detail how any alleged inequitable conduct caused injury to other creditors, because there are not any, nor does the Complaint allege any unfair advantage Wilmington Trust attained over other creditors.

The Plaintiff responds that the Complaint adequately pleads the three requirements for equitable subordination, *i.e.,* (a) inequitable conduct by the claimant, (b) causing injury to creditors or unfair advantage to the claimant, and (c) equitable subordination is not inconsistent with the Bankruptcy Code.  The Plaintiff argues that Wilmington Trust's egregious conduct in breaching fiduciary duties, failing to adequately maintain the Properties, and impeding their sale resulted in the degradation of the Properties' condition and value, delinquent real estate taxes, and the incurrence of attorneys' fees required to sell the Properties.  The Plaintiff asserts that harm to administrative creditors can warrant equitable subordination.

Wilmington Trust replies that the Debtor offers no authority for its argument that administrative creditors whose claims arose solely as a result of the bankruptcy case, or the

---

[28] In its Opposition to the Wilmington Trust Motion to Dismiss, the Plaintiff disavowed any argument that by opposing the Turnover Motion and filing the Stay Relief Motion, Wilmington Trust violated the stay.

debtor itself, are injured creditors for purposes of the required elements of equitable

subordination.  Moreover, Wilmington Trust argues, the Complaint fails to identify action it took

*vis a vis* administrative expense claimants that harmed them.  With respect to alleged harm to the

Debtor, Wilmington Trust argues that the alleged conduct might affect calculation of its claim,

which is the subject of a pending claim objection, but the Plaintiff offers no support for its

argument that it warrants subordination under §510(c).

### b.   The Court's Analysis

In order to succeed on its equitable subordination claim, the Plaintiff must prove that (a)

Wilmington Trust engaged in some sort of inequitable conduct, (b) that resulted in injury to the

creditors of the Debtor or conferred an unfair advantage on Wilmington Trust, and (c)

subordination would not be inconsistent with the Bankruptcy Code.  *See, e.g., In re Nutri/System,*

*Inc.,* 1994 WL 96963, at *3 (Bankr. E.D.Pa. Mar. 23, 1994) (citing *In re Comtec Indus., Inc.,* 91

B.R. 344, 347 (Bankr. E.D.Pa. 1988)).

The Court rejects Wilmington Trust's argument that the Complaint fails to allege

inequitable conduct that resulted in harm to the Debtor and its creditors.  As discussed *supra,* the

Complaint alleges that Wilmington Trust, together with the other Defendants, neglected and

mismanaged the Properties following the second Management Rights Agreement, resulting in the

degradation of their physical condition and increased vacancy, which ultimately resulted in the

Debtor obtaining a lower sale price in this bankruptcy case.  The Complaint's allegations

therefore adequately allege inequitable conduct by Wilmington Trust, and even with dismissal of

Counts II and IV against Wilmington Trust, these allegations form the basis of the surviving

breach of fiduciary duty and waste claim against Wilmington Trust.

36

The Court also rejects Wilmington Trust's argument that the Complaint does not and cannot allege injury to the Debtor's creditors or unfair advantage to Wilmington Trust; the Plaintiff alleges that the Defendants' actions, including Wilmington Trust's, resulted in a lower sale price combined with increased administrative costs, resulting in a "smaller pie" to satisfy claims against the Debtor, including administrative claims. If proven true, these assertions could support at least a partial subordination of the Wilmington Trust Claim to administrative creditors. *See Nutri/System,* 1994 WL 96993, at *3 (declining to dismiss claim seeking to equitably subordinate defendants' claim to plaintiff's administrative claims, finding *inter alia,* that it was possible for the plaintiff to prove that the defendants engaged in inequitable conduct resulting in unpaid administrative expenses).

The Court therefore finds that the Complaint adequately pleads facts that go to the first and second elements of an equitable subordination claim. Wilmington Trust does not argue that equitable subordination would otherwise be inconsistent with the Bankruptcy Code. The Complaint adequately pleads a claim for equitable subordination to survive dismissal pursuant to Rule 12(b)(6). The Court therefore denies Wilmington Trust's request to dismiss Count V of the Complaint.

###    C.    James Paul's Motion to Dismiss

###    1.    The Parties' Arguments

Unlike Wilmington Trust's Motion to Dismiss, James Paul's Motion to Dismiss does not challenge the sufficiency of the Complaint's allegations. It instead argues that the Court lacks subject matter jurisdiction over the claims against James Paul based on application of what is known as the Barton Doctrine, holding that before suit is brought against a court-appointed

receiver, leave of the court which made the appointment must be obtained, absent which no other court has jurisdiction to hear a suit against the receiver. *See Barton v. Barbour,* 104 U.S. 126, 26 L.Ed. 672 (1881). According to James Paul, the Debtor's failure to obtain permission from the Pennsylvania courts that appointed the Receiver prior to filing suit here leaves this Court without jurisdiction to adjudicate those claims. James Paul argues that this failure cannot be rectified after the suit has been filed, which is void *ab initio*.

James Paul acknowledges two exceptions to the Barton Doctrine: (1) the "business exception" codified by 28 U.S.C. §959(a), providing that trustees may be sued without permission of the appointing court if the act in question occurred while carrying on business connected with the estate (the "Estate Business Exception"), and (2) the "ultra vires exception," providing that the Barton Doctrine only protects the trustee for acts done in the trustee's official capacity and within the trustee's authority as an officer of the court (the "Ultra Vires Exception"). James Paul argues, however, that neither exception applies. The Estate Business Exception, James Paul asserts, applies only to acts or omissions in connection with conducting the receivership business in the ordinary course, and does not apply to claims grounded only in injury to the bankruptcy estate and not to third parties. Here, the Plaintiff's claims are based solely on alleged misconduct by the Receiver in the management of the Properties, resulting in injury to the Debtor, not third parties. With respect to the Ultra Vires Exception, James Paul argues that it only applies where the receiver undertakes actions that are beyond the scope of the authority granted by the appointing court. Here, James Paul asserts, all actions the Receiver took were directed by orders of the appointing Pennsylvania courts and were taken within the parameters of those Orders, and the Complaint alleges only that James Paul failed to adhere to

38

the applicable standard of care necessary in managing the Properties.

The Plaintiff argues the Barton Doctrine does not apply because once the Debtor filed its bankruptcy petition, the Receiver became a bankruptcy custodian pursuant to §101(11) of the Bankruptcy Code, subject to this Court's exclusive jurisdiction and compelled to turn over estate property, subject to surcharge for breach of its duties.  The Plaintiff argues that the Supremacy Clause of the United States Constitution and §543 of the Bankruptcy Code authorize bankruptcy courts to review and conclude matters relating to a state court receivership once a bankruptcy petition is filed, and therefore the Receiver is subject to this Court's exclusive jurisdiction. According to the Plaintiff, the *custodia legis* of the appointing Pennsylvania courts ended upon the filing of the Debtor's bankruptcy and the Properties came under this Court's jurisdiction. Having not requested to be excused from turning over the Properties under §543(b), or even oppose the Turnover Motion, the Plaintiff argues the Receiver remains subject to the Court's jurisdiction and is subject to liability for failure to turn over the Properties.

James Paul replies that the Debtor's theory would result in abrogation of the Barton Doctrine in the context of bankruptcy by automatically bringing pre-petition receivership conduct under the jurisdiction of the bankruptcy court.  Wilmington Trust asserts that the courts in this Circuit have clearly found that the Barton Doctrine is not abrogated in bankruptcy.

### 2.    The Court's Analysis

The James Paul Motion to Dismiss reflects the seeming tension between the Barton Doctrine and the nature of bankruptcy.  On the one hand, the Barton Doctrine provides a court-appointed trustee or receiver with a level of protection from suit by requiring authority to sue from the appointing court, subject to limited exception.  On the other hand, once the bankruptcy

is filed, the receivership property becomes property of the debtor's estate, the administration of

which falls under the exclusive jurisdiction of the bankruptcy court, *see* 28 U.S.C. §1334(e), and

Bankruptcy Code §543(b) and Bankruptcy Rule 6002 require a pre-petition custodian to deliver

any custodial property to the trustee and file an accounting.  11 U.S.C. §543(b); F.R.B.P. 6002.

Notwithstanding this friction, the Barton Doctrine was not abrogated by the enactment of the

Bankruptcy Code, and remains valid.  *In re VistaCare Group, LLC,* 678 F.3d 218, 225, 228 (3d

Cir. 2012).

### a.    The Barton Doctrine and Its Exceptions

As a guide for navigating the interplay of the Barton Doctrine with the claims against the

Receiver, the Court finds helpful the opinion authored by my former colleague, Judge Eric L.

Frank, in *Kaliner v. Antonoplos (In re DMW Marine),* 509 B.R. 497 (Bankr. E.D. Pa. 2014), a

decision cited by both the Plaintiff and James Paul and discussed extensively at the Hearing.

There, a chapter 7 bankruptcy trustee filed an adversary action against the Debtor's prepetition

court-appointed receiver, asserting claims for negligence, breach of fiduciary duty, and for the

avoidance of allegedly preferential and fraudulent transfers pursuant to §§547 and 548 of the

Bankruptcy Code, all emanating from the receiver having made an allegedly improper payment

with receivership assets and paying himself excessive compensation.  The defendant receiver

asserted the bankruptcy court lacked subject matter jurisdiction under the Barton Doctrine

because the plaintiff had failed to obtain prior approval for the suit from the appointing court.

The plaintiff argued in response that an exception to the Barton Doctrine existed.[29]

Judge Frank held that the defendant properly invoked the Barton Doctrine and no

---

[29] The plaintiff also argued, in the alternative, that the receiver's delay waived his right to assert the Barton Doctrine. That is not relevant to the case at bar and therefore the Court will not address that portion of *DMW Marine.*

exception applied.  The Court enunciated certain "core principles" of the Barton Doctrine,

distilled from *VistaCare* and *In re CitX Corp.,* 302 B.R. 144 (Bankr. E.D.Pa. 2003), including

that (a) it mandates first obtaining the permission of the receivership court before suing the

receiver, (b) it implicates the subject matter jurisdiction of the nonreceivership court, such that

failure to obtain permission results in the nonreceivership court lacking jurisdiction over the

action against the receiver, and (c) that jurisdictional limitation on the nonreceivership court was

originally grounded in "due regard for the receivership court's control over the [receivership]

property." *Id.* at 503.  The Court then addressed the Estate Business Exception and the Ultra

Vires Exception to the Barton Doctrine.

Turning first to the Estate Business Exception, Judge Frank noted it is a narrow statutory

exception allowing a receiver to be sued in a non-receivership court for action performed while

carrying on the business, but applies only to "'acts or transactions in conducting the debtor's

business in the ordinary sense of the words or in pursuing that business as an operating entity.'"

*Id.* at 504 (quoting *In re Crown Vantage, Inc.,* 421 F.3d 963, 971-72 (9th Cir. 2005)).  The court

cited the example of a negligence claim for a slip and fall while the receiver is operating a retail

location.  *Id.*  Importantly, Judge Frank noted the following limitation: "[T]he exception is not

intended to permit actions against a receiver in a non-receivership forum for alleged misconduct

in the administration of receivership property (as opposed to torts committed against parties

doing business with the entity in receivership)." *Id.* (citing *Muratore v. Darr,* 375 F.3d 140, 146

(1st Cir. 2004) and *In re Cutright,* 2012 WL 1945703, at *6 n.9 (Bankr. E.D.Va. May 30, 2012)).

Given its narrow application and limitations, Judge Frank found the Estate Business

Exception did not apply to the plaintiff's claims.  First, the negligence and breach of fiduciary

duty claims did not allege that the receiver's actions caused direct injury to any third parties, but instead were alleged to have injured the debtor itself.[30]  As such, they did not stem from the receiver's conduct of the debtor's business and fell outside the exception.  Likewise, the plaintiff's bankruptcy claims under §§547 and 548 of the Bankruptcy Code were grounded in injury to the bankruptcy estate, not injury to third parties, and therefore were also outside the exception.  The court acknowledged the argument that the preference and fraudulent transfer claims, which sought to hold the receiver personally liable rather than seek recovery from receivership property, would not appear to interfere with the administration of the receivership or receivership property, but found that the concerns underlying the Barton Doctrine still applied to these Bankruptcy Code claims as well.  First, transfer avoidance actions have a substantial potential for injecting the bankruptcy court into the administration of the receivership.  Second, the rationale for the Barton Doctrine had evolved from simply preventing a federal court from interfering with another sovereign court's control over receivership *assets* to also protecting the office of the receiver.  Third, Judge Frank saw no substantial bankruptcy policy warranting a trumping of the Barton Doctrine, as application of the doctrine merely requires a bankruptcy trustee to appear before the receivership court to make a threshold showing of merit in order to receive authorization to sue.

Having found the Estate Business Exception inapplicable, Judge Frank examined the Ultra Vires Exception.[31]  He observed that the exception applies where a receiver acts beyond the

---

[30] Judge Frank was not persuaded by the plaintiff's argument, also made here, that the receiver's actions indirectly injured third parties insofar as they left the debtor unable to pay its creditors.

[31] It is questionable whether the Ultra Vires Exception is even viable in this jurisdiction, as the Third Circuit's discussion of the Barton Doctrine in *VistaCare* only recognized the Estate Business Exception.  *See In re United Tax Group, LLC,* 2018 WL 1187395, at *4 (D. Del. March 7, 2018) (affirming bankruptcy court's determination that

scope of their authorized duties, with the "classic application" being an action against a receiver who seizes or otherwise attempts to administer property that is not receivership property, but that actually belongs to a third party. *Id.* at 506 (citing cases). Judge Frank then noted that courts have scaled back the exception over time to apply it only in cases in which a receiver wrongfully seizes or controls non-receivership property. *Id.* at 507. As Judge Frank opined with respect to the Estate Business Exception, the disfavor with which courts have viewed the exception is based on the rationale of protecting trustees and receivers from claims related to their official actions for which they are personally liable. *Id.* In view of the limited scope of the Ultra Vires Exception, the court found it inapplicable: "[T]he trustee is seeking damages from the Receiver and his complaints regarding the Receiver's conduct in connection with what may be characterized as 'case administration,' not the seizure of non-receivership property. It follows that the 'ultra vires' exception is inapplicable." *Id.* at 508-09.[32]

### b.     Application of the Barton Doctrine to the Plaintiff's Claims

The Complaint asserts three Counts against James Paul and ALPS Group: Count I seeks an accounting, Count III asserts breach of fiduciary duty and waste claims, and Count IV asserts violation of §§543(b) and 362(a) of the Bankruptcy Code.

The Court addresses first Count III's claims breach of fiduciary duty and waste claim. The Court agrees with Judge Frank's conclusion that the Estate Business Exception does not apply to common law claims such as negligence and breach of fiduciary duty. The claims in

---

*VistaCare* only recognized the Estate Business Exception, and the Third Circuit has not recognized the Ultra Vires Exception, and therefore the bankruptcy court was not required to analyze the exception's applicability at all).

[32] Judge Frank also noted that courts have rejected the argument that the Barton Doctrine no longer applies after the receivership has concluded. *Id.* at n.19 (citing cases). As such, although the Properties were sold in the Debtor's bankruptcy case here, that does not vitiate the argument that the Barton Doctrine precludes suit against James Paul and ALPS Group.

Count III do not assert or relate to damage third parties incurred as a result of the Receiver's alleged mismanagement of the Properties and self-dealing; they only assert that the Debtor itself was harmed.  Moreover, like Judge Frank, the Court is not persuaded that any indirect harm suffered by estate creditors due to the alleged degradation of the Properties and reduction in their value is the type of direct injury to third parties resulting from the receiver's operation of the business that the Estate Business Exception is meant to address.  The exception therefore does not apply to Count III's claims.  Nor does the Ultra Vires Exception.  There is no allegation that the Receiver seized or otherwise attempted to administer property that is not receivership property.[33]  Neither exception to the Barton Doctrine is applicable, and the Plaintiff was therefore required to first seek authority from the Pennsylvania Receivership courts to bring the Count III claims against James Paul and ALPS Group.  Having failed to do so, this Court lacks subject matter jurisdiction over them.

Count IV's claim, however, asserting that the Receiver violated its post-petition duties under §§543(b) and 362(a), is distinct from the fiduciary duty and waste claim in two important ways as it relates to application of the Barton Doctrine.  First, it is a claim borne out of the requirements of the Bankruptcy Code upon the filing of the Debtor's bankruptcy petition.  The filing of the Debtor's bankruptcy petition vested this Court with exclusive jurisdiction over property of the Debtor's estate, including the Properties.  *See* 28 U.S.C. §1334 (e); *see also The Billing Resource, dba Integretal v. Fed. Trade Comm.,* 2007 WL 3254835, at *21 (Bankr. N.D. Cal. Nov. 2, 2007) ("[O]nce a bankruptcy petition is filed, section 1334(e) of title 28 is

---

[33] Although the Plaintiff asserts in Count IV that James Paul and ALPS Group failed to turn over the Properties post-petition in violation of the §543(b) and §362(a), that is a distinct theory from an assertion that the Properties were improperly seized to begin with because their administration was beyond the scope of the receivership, particularly in light of the narrow view of the Ultra Vires Exception.

44

unequivocal in its grant of exclusive jurisdiction to the bankruptcy court over all property, wherever located, of Debtor as of the commencement of such case."). Therefore, as of the Petition Date, the Pennsylvania Receivership courts no longer exercised jurisdiction over the Properties, and the Receiver no longer administered them as an officer of those courts. Rather, the exclusive *in rem* jurisdiction over those assets passed from the Receivership Courts to this Court upon the bankruptcy filing. *See Billing Resource,* 2007 WL 3254835, at *22. In the context of that unique dynamic, the Barton Doctrine does not apply to require the Receivership courts' leave to sue the Receiver in this Court. *Id.* (finding that the Barton Doctrine did not apply to an action against a pre-petition receiver for funds that were receivership property but thereafter came under the exclusive jurisdiction of the bankruptcy court).

The second distinction, both from the fiduciary duty and waste claim in the Complaint and from the claims that were before Judge Frank in the *DMW Marine* case, is that the claim in Count IV seeks to hold the Receiver liable solely for the *post-petition* failure to turn over the Properties. The Barton Doctrine only applies to "acts done in the [custodian's] official capacity and within the trustee's authority as an officer of the [appointing] court." *Bednar v. Bednar (In re Bednar),* 2021 WL 1625399, at *4 (B.A.P. 10th Cir. 2021). The key inquiry in determining whether the doctrine is applicable is "whether the claims arose out of the [custodian's] conduct during the course of the [custodial] case, while the case was still open." *Rodriguez v. Schmidt (In re Rodriguez),* 2021 WL 5236832, at *3 (Bankr. S.D. Tex. Nov. 10, 2021) (rejecting argument that, because the underlying bankruptcy case had been closed, the debtor did not have to seek bankruptcy court approval to sue the bankruptcy trustee in state court alleging state law tort claims,). As such, where the claims arise from conduct that occurred either before or after

45

the receivership proceeding, the Barton Doctrine does not apply. *See In re J.S., L.L.C.,* 389 B.R. 570, 584 (Bankr. N.D. Ill. 2008) (finding the Barton Doctrine inapplicable to plaintiff's undercapitalization claim against bankruptcy trustee/debtor-in-possession because the events underlying it occurred pre-petition and not during the administration of the bankruptcy estate, but that it would apply to any claim arising from acts occurring after the petition date). The Barton Doctrine is therefore inapplicable to Count IV's claim, because the Receiver's conduct that is alleged to have violated the turnover and automatic stay provisions of the Bankruptcy Code occurred entirely post-petition, when jurisdiction over the Receivership property passed to this Court and the Receiver no longer administered it as an officer of the Pennsylvania Receivership courts.

This leaves the Complaint's claim for an accounting in Count I. As the Court observed at the Hearing, the nature of this claim differs from those in Counts III and IV. Section 543(b) and Bankruptcy Rule 6002 require that an accounting be filed, creating bankruptcy-imposed obligations. Courts have concluded or intimated that §543's requirements trump the Barton Doctrine. *See In re Automotive Professionals, Inc.,* 2007 WL 1958595, at *7 (Bankr. N.D. Ill. July 3, 2007) (observing that §543(b) was enacted long after *Barton* was decided and expressly requires turnover of a debtor's assets that are subject to state court receivership orders, thereby superseding the Barton Doctrine with respect to a debtor's action to compel turnover of its property); *CitX,* 302 B.R. at 151 (stating that §543(b) may undermine the Barton Doctrine, and citing *In re Kreisers, Inc.,* 112 B.R. 996 (Bankr. D.S.D. 1990), in observing that §543 has been applied once an entity subject to a state court receivership proceeding files bankruptcy). Moreover, the Court's previously entered Turnover Order also expressly required "James Paul of

46

the ALPS Group, LLC" to turn over the Properties *and* file an accounting.  See Turnover Order, at ¶1(g).  That has not happened and Count I of the Complaint is effectively a motion to compel the Receiver to comply with the obligation this Court has already imposed.  The Barton Doctrine does not protect a receiver from complying with an order of the bankruptcy court.  *See Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 129 S. Ct. 2195, 2205, 174 L.Ed. 2d 99 (2009) (a bankruptcy court always has jurisdiction to interpret and enforce its own prior orders).  As such, the Barton Doctrine does not apply to Count I of the Complaint to begin with, making any discussion of its exceptions inapplicable as well.  The Court has and will exercise its subject matter jurisdiction over Count I's claim for an accounting from the Receiver.

<strong>c.</strong>      <strong>The Court's Conclusion on the James Paul Motion to Dismiss</strong>

In summary, the Barton Doctrine applies to the claims against the Receiver in Count III, and neither the Estate Business Exception nor the Ultra Vires Exception apply.  The Plaintiff is therefore required to seek and obtain authority from the Pennsylvania Receivership courts to bring this claim.  The Barton Doctrine does not, however, apply to the claims against the Receiver in Count I or Count IV.  The Plaintiff therefore was not required to seek and obtain authority from the Pennsylvania Receivership courts to bring those claims, and this Court has subject matter jurisdiction over them.

**VI.    CONCLUSION**

With respect to the Wilmington Trust Motion to Dismiss, the Court will grant it in part and deny it in part.  The Court will dismiss Counts II and IV of the Complaint against Wilmington Trust with prejudice, pursuant to Rule 12(b)(6) for failure to state a claim.  The Court will also dismiss Count I of the Complaint against Wilmington Trust with prejudice,

pursuant to Rule 12(b)(6) for failure to state a claim, to the extent it seeks an accounting for the period after the Receiver was appointed.  The Court will not, however, dismiss Count I against Wilmington Trust for an accounting for the portion of the Custodial Period between the date the second Management Rights Agreement was entered into on September 3, 2019, and the dates the Receiver was appointed, on March 10, 2022 with respect to the Philadelphia Properties, and March 18, 2022, with respect to the Delaware County Properties.  The Court also will not dismiss Count V against Wilmington Trust.

With respect to the James Paul Motion to Dismiss, the Court will grant it in part and deny it in part.  The Court will dismiss Count III of the Complaint against the Receiver without prejudice, pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.  The Court will not dismiss Count I of the Complaint against the Receiver to the extent it seeks an accounting for the period from the time the Receiver was appointed, on March 10, 2022 with respect to the Philadelphia Properties, and March 18, 2022 with respect to the Delaware County Properties, until the Receiver turned the Properties over to the Debtor pursuant to the Turnover Order.  The Court also will not dismiss Count IV of the Complaint against Wilmington Trust, as the Barton Doctrine does not apply.

The Court shall issue an Order consistent with this Memorandum contemporaneous herewith.

Dated:  June 25, 2024

_____
MAGDELINE D. COLEMAN
U.S. BANKRUPTCY JUDGE